# EXHIBIT 4

## American Arbitration Association

| | |
|---|---|
| **John Pearson** | :   Arb. No.  01-20-0000-5245-1 |
| 126 Mcintosh Bluff | : |
| Fairhope, AL 36352 | : |
| | : |
| | :   **FIRST-AMENDED ARBITRATION** |
| -and- | :   **DEMAND** |
| | : |
| **Tensaw Investment Group, LLC** | : |
| **d/b/a Zippy Shell of Greater** | : |
| **Mobile** | : |
| 126 Mcintosh Bluff | : |
| Fairhope, AL 36352, | : |
| | : |
|        Claimants, | : |
| | : |
|    v. | : |
| | : |
| **Zippy Shell Incorporated** | : |
| 11640 Northpark Dr., Suite 200 | : |
| Wake Forest, NC 27587 | : |
| | : |
| -and- | : |
| | : |
| **1-800-Pack-Rat, LLC** | : |
| 11640 Northpark Dr., Suite 200 | : |
| Wake Forest, NC 27587 | : |
| | : |
| -and- | : |
| | : |
| **Mark Kuhns** | : |
| 11640 Northpark Dr., Suite 200 | : |
| Wake Forest, NC 27587 | : |
| | : |
| -and- | : |
| | : |
| **Rick Del Sontro** | : |
| 801 Brickell Ave, Suite 900 | : |
| Miami, FL 33131 | : |
| | : |
| -and- | : |
| | : |
| **Gareth Taylor** | : |
| 11640 Northpark Dr., Suite 200 | : |
| Wake Forest, NC 27587 | : |

```
                                              :
-and –                                        :
                                              :
Danielle Scott                                :
801 Brickell Ave., Suite 900                  :
Miami, FL 33131                               :
                                              :
-and-                                         :
                                              :
Jay Young                                     :
11640 Northpark Dr., Suite 200                :
Wake Forest, NC 27587                         :
                                              :
-and-                                         :
                                              :
John and Jane Does 1-10,                      :
                                              :
              Respondents.                    :
```

## SUMMARY

1.      This section summarizes the factual basis for and claims of John Pearson ("**Pearson**") and Tensaw Investment Group LLC DBA Zippy Shell of Greater Mobile ("**Tensaw**") against Respondents.  The list of wrongs is long, and the supporting facts are many.  The Summary also outlines the sections of the Demand.

2.      In December 2015, Pearson became a franchisee of Zippy Shell Incorporated (with its predecessors, successors (including "New Zippy" as defined later, and affiliates, "**Zippy**"), which is a moving and mobile self-storage business.

3.      Zippy used grossly inflated pro formas and other deceptions to persuade Pearson to become a franchisee.  The pro formas showed him building a business that in five years would have sustainable profits of $700,000 a year and that could be sold within five years for over $8 million.  The pro formas had no real-world basis and were aimed solely to deceive.  Further, under the Federal Trade Commission ("**FTC**") rule governing the sale of franchises (16 CFR Part 436) (the "**Rule**"), Zippy was prohibited from presenting any financial performance information to franchisees, let alone fraudulent pro formas.

4.      Zippy had carried on this fraudulent scheme with other prospective franchisees since at least 2012 and continued to do so through 2018.  Rick Del Sontro ("**Del Sontro**"), Gareth Taylor ("**Taylor**"), and later Danielle Scott ("**Scott**") and John and Jane Does 1-10 ("**JDoes**") were involved in generating the pro formas and using them to fraudulently induce prospective franchisees into becoming its actual franchisees (the "**Franchisees**"). Zippy continued to use the pro formas to sell franchises even though it knew that no Franchisee achieved returns remotely close to the pro forma

numbers, that it had high turnover from Franchisees closing, and that its corporate stores were all losing money or barely breaking even.

5.      Zippy, with the direct participation of Del Sontro, Taylor, Scott, Mark Kuhns ("**Kuhns**"), Jay Young ("**Young**"), and JDoes, also engaged in other fraudulent schemes against prospective  or actual Franchisees,  including:

    a.   Compounding its fraudulent pro formas by giving franchisee prospects marketing brochures stating that if they become Franchisees, they could sell their businesses at 12 times earnings, giving the impression that their businesses would be worth amounts generally between $8-12 million.

    b.   Concealing from franchise prospects and Franchisees that for a number of years Zippy operated without proper moving authority from the Department of Transportation ("DOT"), and that the DOT had revoked its brokerage authority and household goods authority for extended periods of time.

    c.   Knowing that Franchisees required operating authority as a carrier of household goods, a more difficult authority to obtain and operate under, Zippy intentionally deceived Franchisees into obtaining operating authority as a carrier of common goods, but not household goods, so as to avoid government scrutiny and speed the pipeline of opening and conducting their moving business.

    d.   Concealing from Franchisees that Zippy operated a clandestine business operation (the "**Clandestine Operation**") providing move opportunities to certain Franchisees and third parties into and out of the other Franchisees' exclusive territories that the Franchisees could have handled.

    e.   Inducing franchisees to buy equipment and make business decisions by promising rapid business growth of the system without telling them that Zippy planned to acquire Pack-Rat and dismantle the Zippy franchise system.

6.      In late 2017, Zippy's majority owner, Virgo Investment Group, LLC ("**Virgo**"), was dissatisfied with Zippy's lackluster financial performance.  Virgo and Zippy decided to radically transform the company into an owned-and-operated company-unit business by acquiring and merging with Pack-Rat (the ("**Merger**"), which did eight times the volume of Zippy and operated through all owned-and-operated company units (other than one franchisee).

7.      In February 2018, Virgo and Zippy issued a prospectus (the "**Prospectus**") to raise funds for the Merger.  The Prospectus presented information, which was concealed from the Franchisees, that franchising was a detriment to

profitability in the moving and self-storage business, and that, on consummation of the Merger, Zippy would immediately begin dismantling support for its franchisee system and instead offer full support and economies to the operationally-consolidated corporate-model company ("**New Zippy**").

8.    In June 2018, Virgo and Zippy consummated the Merger.  As part of the merger, Zippy transferred the competitive advantages of its model (33% core efficiencies according to the Prospectus) to Pack-Rat, thereby destroying the competitiveness of the Franchisees and forcing Pearson (and over a dozen others) out of business.  Virgo actively planned for and then assisted in carrying out this strategy, knowing that it would destroy the Franchisees.

9.    Pearson and Tensaw's cash losses are over $1 million.  Their expectation damages exceed $8 million.

10.    To help follow the factual presentation in the Demand, here's an outline of the facts section:

- Section I presents the parties and their business models.  (pp. 5-14)

- Section II details all of Respondents' fraudulent schemes. (pp. 14-21) (The remaining sections are chronological.)

- Section III explains how Zippy fraudulently induced Pearson into becoming a franchisee through fraudulent marketing materials, FDD, and pro formas, and his first year in business. (pp.21-24)

- Section IV discusses how Virgo and Zippy developed the merger plan to create a consolidated Zippy/Pack-Rat corporate-unit system, which included undermining and eliminating the franchise system, and how they executed the plan, leading to the collapse of the franchise system and Pearson's closing his business. (pp. 24-31)

11.    Pearson's legal claims against Respondents are for breach of contract and the covenant of good faith and fair dealing, fraudulent inducement, and violation of the Racketeer Influenced and Corrupt Organizations Act ("**RICO**").

## FACTS

## I.    The parties and their business models

### A.  Zippy: exclusive-territory franchisees and corporate units

12.    Zippy, originally an Australian business, was brought over to the United States by Taylor in 2009, and has offered franchises since then.  It always had a small number of corporate-owned and -operated units as well.

13.    The franchisees are provided exclusive territories defined by zip codes.

14.    At one point, Zippy had about 60 franchisees.  It now has just a few and will soon have none.  With the collapse of the franchise system, Zippy has offered Franchisees the option to continue in the business as third-party licensees for Zippy and Pack-Rat.  Having recognized in late 2017 that the franchise model isn't profitable, Zippy stopped selling franchises in 2018.

15.    Before the Merger, Zippy had six corporate units.  On information and belief, it now has one, which is likely to close soon.  New Zippy operates through over 70 Pack-Rat locations, a small group of Zippy/Pack-Rat licensees, and the few remaining Franchisees.

### (i)    The initial mobile-storage model

16.    In 2009, Zippy started offering franchises that provided mobile self-storage units.  Its market-differentiator was its unique delivery and storage system.  The basic model was that Franchisees would drop off a specially-designed storage unit, called a cartridge or container, in a specially-designed, enclosed-cargo trailer, called a shell, to their customers, who would then load their goods into the container. Franchisees would then pick up the trailer and container, and transport them to a warehouse, where the container would be removed and stored.  When customers wanted their goods back, the process would be reversed, and the container and shell would be delivered to the customer to be unloaded.  Customers could keep the containers at their house for a few days while loading or unloading.  Zippy separately offered to provide customers with on-site containers, which customers could keep at their homes for a period of time for self-storage.

17.    The mobile self-storage business was a relatively young, niche business that differentiated itself from the more mature long-term self-storage business, where customers brought their goods to fixed storage units to store them.  The mobile storage business aimed to be more convenient for customers by bringing the storage unit directly to the customer.  Its prime target customers were apartment renters and younger families.

18.    Zippy's business model was to develop a low-cost, proprietary, unique delivery and storage system that would allow it to be the lower-priced alternative in mobile storage.

19.    Franchisees could also use the trailer and cartridges in local moves for customers.

20.    Storage customers would pay Franchisees pickup and redelivery fees and monthly storage fees, and ancillary fees such as packing supplies and content protection. Moving customers would pay fees for using Zippy's specially-designed system to move goods from point to point.

21.     Zippy's proprietary, unique delivery and storage system gave Franchisees a 33% profit advantage over its second-biggest competitor, Pack-Rat.  The savings were primarily due to two factors:  (i) the lower initial costs of Zippy's moving equipment than Pack-Rat's, and (ii) the lower cost of Zippy's specially-designed delivery system, that used heavy-duty pick-up trucks and cargo trailers for long-distance moving as compared to Pack-Rat's system, which used large, commercial flat-bed delivery trucks outfitted with a hydraulic lift system.   This savings allowed Franchisees to be competitive, recognizing that they had the added cost of franchise fees, which Pack-Rat units didn't have as they were corporate units.  Zippy's sales materials touted that based on its proprietary systems and equipment, franchisees would earn a higher return-on-investment at lower investment cost than Zippy's competitors earn.

22.     Before the Merger, Zippy supported the Franchisees by operating a centralized call center, offering a broad array of marketing materials and services, developing an information technology system for franchise reservations, billing, and inventory management, as well as other operational and logistical support services and initiatives.

23.     Franchisees were to market the brand with its unique delivery system, and then deliver their services within their respective exclusive territory. One of the primary means of brand building was to articulate the benefits and advantages of Zippy's system compared to their competitors.

### (ii)    The development of the long-distance model

24.     Zippy's original business model was flawed.  Franchisees and corporate units could not be profitable based solely on mobile self-storage.  Unlike traditional storage, customers did not keep their goods in storage for longer periods of time, and the revenue was seasonal.  Franchisees began closing because of mounting losses.

25.     In 2013, Zippy launched a long-distance, containerized moving program that offered labor services as well.  Offering labor was unique to the market and a differentiator.  The service would be referred to as the ZipMove program (**"ZipMove"**). Franchisees could participate in ZipMoves in three ways:

      a.  Local customers who wanted to move could book their move through Zippy.  The local Franchisee would deliver the container to the customer for the customer to pack up, or the local Franchisee could provide the labor for a fee.  Customers generally hired the local Franchisee to provide labor as this involved moving furniture and other bulky and heavy goods that needed to be professionally packed.  Local customers often stored the goods for some period of time before they moved, and franchisees were required to store goods for 30 days before receiving storage payments.

b.   Once the container was ready for freight at the origin warehouse, Zippy would contract with a common carrier to transport the goods in a dry van between the origin and destination warehouses, or Franchisees with the appropriate equipment could transport the goods themselves.

c.   The Franchisee at the destination would receive the containers.  It often stored them for some period of time before the customer was ready to have the cartridge delivered.  The Franchisee would then deliver the cartridge to the customer, and would often provide the labor for a fee to unload the goods and move them into the house.

26.    One of the key competitive features of ZipMoves was that Zippy sold containerized long-distance moves that included labor services, including loading and unloading of containers, and packing services.  Offering labor was unique to the market and a differentiator compared to Zippy's containerized long-distance move competitors.

27.    Beginning in 2016, Zippy started the ZipMove Relocation Program ("**Relo**"), where it entered into national contracts with companies to move their employees to new locations.  Franchisees entered into contracts with Zippy that governed the terms of Relos. Franchisees could participate in Relos in the same three ways (origination, transport, and destination) that they could with ZipMoves.

28.    In selling to prospects, Zippy stressed the ZipMove and Relo programs as significant generators of revenue and the core of the business.  The change in business model was so significant that Zippy changed its marketing name to stress that moving was primary and storage secondary.  It changed its marketing tagline from "Zippy Shell: Storage and Moving that Makes Life Simple" to "Zippy Shell: Moving & Storage Made Simple". Zippy updated all marketing materials, logos, websites, and other branding material to reflect the new emphasis on moving.

29.    As the Zippy franchise network grew from 2015-17, and Zippy developed its use of third-party providers in areas where it didn't have Franchisees or corporate units, new shipping lanes and service markets grew, creating an increasing number of move opportunities.  Zippy's sales efforts to franchisee prospects stressed this part of the business, and Franchisees' revenue from ZipMoves and Relos became significantly larger parts of their businesses.

30.    Beginning in 2018, Franchisees who wanted to participate in ZipMoves and Relos were required to enter into contracts with Zippy called SOPs, which governed the terms of ZipMoves and Relos.

31.    Under the 2018 SOP, Zippy was obligated to offer the ZipMove opportunity to qualified Franchisees for their exclusive territories at origin and destination.  If, and only if, the Franchisee declined the opportunity or it couldn't compliantly perform, could Zippy refer the opportunity to a third party (the "**Referral Guaranty**").  The 2018 SOP stated:

> [Zippy] will undertake all reasonable efforts provide the business to both the Zippy Shell franchisees and corporate owned locations where possible and so long as the[ Zippy] franchisees and corporate owned locations performed all required tasks in compliance with this SOP and [Zippy's] internal policies.

32.    As part of the 2018 SOP and its Referral Guaranty, Zippy was required to notify the local Franchisee of *all* ZipMove and Relo origin and destination bookings by email within twenty-four (24) hours, providing the local Franchisee with the customer name, origin, destination, date of service, type of service and payment for services.  The local Franchisee was required to respond within one business day as to its availability to service the client.

### (iii)  Zippy's primary competitors: Pack-Rat and PODS

33.    Before the Merger, Zippy provided its Franchisees extensive support in competing against its two primary competitors, Pack-Rat and PODS.  Zippy monitored pricing for Pack-Rat and PODS across all product lines and encouraged Franchisees to price lower than Pack Rat and PODS because of Zippy's lower costs of operations.  Zippy would provide Pack Rat and PODS pricing bi-weekly to Franchisees in a marketing deck with the title "Competitor Pricing."

### B.  Pack-Rat

34.    Before the Merger, Pack-Rat was the second-largest mobile-storage business in the United States.

35.    Pack-Rat was originally a franchise-based business.  Executive management grew it from 3 units in 2005 to 71 locations in 2018, while strategically transforming the business from a franchise model to a centrally-managed business model with corporate-owned and -operated units.  At the time of the Merger, there was only one franchise left.

36.    Before the Merger, Pack-Rat was much better known and significantly larger than Zippy.  Pack Rat had almost twice as many locations as Zippy, eight times the revenue, 85 times the profit, and more than eight times the containers.

37.    Notwithstanding this size disadvantage, Franchisees were able to compete with local Pack Rats before the Merger because of economic, equipment, vehicle, and operational efficiencies:

  a.  Pack-Rat's delivery system used large, commercial flat-bed trucks with specialized hydraulic lift systems, while Zippy's used its specially-designed shells that could be delivered with regular non-commercial heavy-duty pick-up trucks.

    b. Because of this and other Zippy efficiencies, Zippy moves were 33% more profitable for Franchisees compared to the like costs for Pack-Rat units. Although Franchisees had to pay franchise fees, the Zippy system's favorable economics allowed Franchisees to competitively price moves and storage against Pack-Rat.

    c. Franchisees directly provided labor for moving and storage, whereas Pack-Rat instructed customers that they would have to hire third parties for loading and unloading.

    d. Franchisees had the benefit of the nationally-marketed ZipMove and Relo programs.

### C. Virgo

38.    Virgo, which is Zippy's largest shareholder, is a middle-market private equity firm that, as of the time of the Merger, had invested over $1 billion in 48 investments. Virgo is not a party to this proceeding, but is discussed here because as part of narrating the facts of this case.

#### (i)    Virgo's prior success buying and flipping PODS

39.    In 2007, Virgo's founding partner Mack McNair led the debt financing for a company named Arcapita to acquire PODS for $430 million. Virgo was one of the primary investors in the deal.

40.    Starting in 2012, McNair led the effort to finance the PODS corporate roll-up strategy that led to PODS becoming the leading mobile-storage company in the nation.

41.    In February 2015, Arcapita (and Virgo as investor) sold PODS for $1 billion, more than doubling its money and making $570 million in profit.

42.    Virgo director Ransom James was PODS' chairman and was instrumental in the purchase, growth, and sale of PODS.

#### (ii)    Virgo seeks through Zippy to replicate its PODS success.

43.    In June 2015, flush with cash and looking to repeat its substantial buy-grow-sell strategy with PODS, Virgo invested $25 million in Zippy to develop a similar roll-up strategy.

44.    McNair became chairman of Zippy's Board of Directors and James was a Member of the Board. Both were deeply involved in strategy, planning, and implementation at Zippy.

### (iii)   Virgo is active in management, not a mere passive investor.

45.    According to the press release announcing the Merger, Virgo is not a passive investor; it actively participates in transforming its acquired companies.  The release states:  "Virgo is an actively engaged investor that seeks to contribute ideas and human capital to the harvesting of value post-investment and has a history of partnering with founder entrepreneurs and management teams."  *Id.*

46.    Virgo's website stresses the active role it plays in the companies it manages:  "We don't just 'buy' value; we work to 'create' value. The Firm's Spica Alpha Unit drives value-add initiatives post-investment via a focus on human capital transformation, business process enhancement and technology implementation."

47.    Virgo's website expounds on the Spica Alpha's "active engagement" in companies that it must be intense "high touch" participation.  The website states as to the Spica Alpha unit:

> At Virgo, we are focused on scaling and institutionalizing disruptive, high growth companies.  We are also focused on re-inventing businesses in transition through re-imagination of strategy and enhanced management.   We target companies during times of industry and management evolution.

> This strategy requires *active engagement* with our companies. In addition, because we are dealing with smaller businesses, which are more prone to the ups and downs, we must be *high touch* in our approach.

> The Spica Alpha Unit drives value-add initiatives post-investment via a focus on human capital transformation, business process enhancement and technology implementation....

(italics added) https://www.virgo-llc.com/spica-alpha-unit

48.    Virgo directly paid consultants under its direction to work with Zippy on developing marketing and growth plans.

### D. Rick Del Sontro

49.    Del Sontro joined Zippy Shell in 2009, and served as President or CEO until March, 2018, when he was terminated.  Since at least 2012, Del Sontro developed fraudulent pro formas and used them to induce prospective franchisees to sign franchise agreements with Zippy.

50.    From 2008 to 2013, in addition to his employment with Zippy, Del Sontro served as CEO of the Rainy Day Foundation ("**RDF**"), whose stated purpose was charitable counseling to new home buyers.

51.    In 2015, the United States filed a civil suit against RDF and Del Sontro, among others, for mortgage fraud.  The United States filed the civil suit in the Eastern District of New York, under Civil Action No. 2015-5576.

52.    The United States' allegations included the following:

    a.  RDF and Del Sontro participated in a federal program sponsored by the United States Department of Housing and Urban Development ("**HUD**"), which allowed lenders to make mortgage loans that are insured by the Federal Housing Administration in the event of default.

    b.  The mortgage lenders' loans went into "early payment default" at more than twice the average default rate of other lenders, and the lenders conspired with the RDF to conceal their high default rates from HUD to avoid removal from HUD's program.  Specifically, the defendant mortgage lenders funneled their own money through the RDF to make defaulting borrowers' monthly payments to the banks in order to conceal the defaults from HUD and the banks.

    c.  When the loans had aged beyond the bank's contractual right to force repurchase, or past the period that HUD monitored for early payment defaults, the lenders would stop making payments, leaving the borrowers without any further support.

    d.  When RDF attracted scrutiny from the United States, it quickly reorganized as a new business, Default Mitigation Services ("**DMS**"), to continue RDF's money-funneling activities under a new name.

    e.  Del Sontro and the other defendants sought to further conceal their activities by claiming that the illicit payments were charitable "grants" made by a small American Indian tribe, located in Ely, Nevada – the Ely Shoshone tribe.  In reality, DMS was again funneling money from the defendant mortgage lenders, through Ely Shoshone tribal bank accounts, to the banks holding the loans.

53.    In the complaint, the United States specifically sought treble damages and penalties under the False Claims Act, 31 U.S.C. § 3729 et seq.; fines under the Financial Institutions Recovery, Reform and Enforcement Act, 12 U.S.C. § 1833a; and damages and indemnification under the common law theories of gross negligence, breach of fiduciary duty and unjust enrichment.

54.    RDF and Del Sontro eventually settled the lawsuit by executing a Consent Decree and Order of Settlement Concerning Rick Del Sontro and The Rainy Day Foundation, Inc. ("**Settlement Order**").  In the Settlement Order, RDF and Del Sontro admitted to the mortgage fraud.  Specifically, RDF and Del Sontro admitted to:

    a.  notifying certain lenders when the lenders' delinquency and default ratios were about to exceed HUD thresholds that would trigger HUD investigations;

    b.  advising the lenders on the amount of payments needed to artificially suppress the lenders' delinquency and default ratios below HUD's thresholds for investigation;

    c.  accepting funds from the lenders and, at the lenders' direction, paying the borrowers' mortgages to bring the mortgages out of default or delinquency;

    d.  intending for these payments to artificially suppress the lenders' delinquency and default rates;

    e.  the unlawful payments , in fact, suppressing the lenders' overall delinquency and default ratios as reported to HUD; and

    f.  the payments permitting the lenders to continue originating and endorsing mortgages back by government programs, when their high default rates would otherwise have resulted in an investigation and the removal of the lenders from the program.

55.    As part of the Settlement Order, RDF agreed to pay the United States $116,000, and Del Sontro agreed to pay the United States $150,000.  Further, RDF and Del Sontro were debarred from participating "in any fashion in any activity having to do with the provision of monies to any borrower whose loan is involved in any federally-related program or is federally-insured."  Notwithstanding this debarment, Del Sontro continued to participate in assisting Franchisees obtain SBA-guaranteed loans.

**E.  Gareth Taylor**

56.    In 2007 in Australia, Taylor developed Zippy with its unique container/shell storage and moving system.  In 2009, he brought it to the United States.

57.    Taylor has been President of Zippy Shell since 2014.

58.    Taylor created the first fraudulent pro forma in 2010.  Zippy has continued to use that pro forma as the starting template for all its subsequent pro formas.  Along with Del Sontro, Taylor was responsible for creating fraudulent pro formas and using them to induce prospective franchisees to sign franchise agreements with Zippy.

59.    On information and belief, Taylor has an undisclosed ownership or other profit interest in an entity or entities that benefit from being part of the supply chain of cartridges to Zippy franchisees, and Zippy failed to make this mandatory disclosure in its Franchise Disclosure Document.

### F.  Mark Kuhns

60.    Beginning in January, 2017, Kuhns became CEO of Zippy.  Since January 2019, has been CEO of New Zippy business.

61.    According to the Prospectus, Virgo assembled the Zippy management team following its investment in Zippy in 2015, "including hiring direct to consumer veteran Mark Kuhns as CEO in 2017."  Kuhns had a "15+ year relationship with Gary Krauthamer and Todd Dorfman (Virgo Founding Partners)."

62.    Kuhns has directed and participated in all of Zippy's fraudulent schemes since January 2017.

### G.  Danielle Scott

63.    Scott joined Zippy Shell in February 2017 and was terminated in May 2018.  She was Director of Franchise Sales and Vice-President of Franchise Operations and Development.

64.    Along with Del Sontro and Taylor, Scott developed fraudulent pro formas and used them to induce prospective franchisees to sign franchise agreements with Zippy.  She included these as part of a webinar series that she would present to individual prospects.

65.    In March 2018, Scott developed and emailed the Franchisees false forecasts of growth in ZipMoves with the intention to induce the Franchisees to buy more equipment and make business decisions premised on falsely-projected increased growth.

### H. Jay Young

66.    Young was Zippy Director of Operations and Sales from 2014-2015 and VP of Operations for Zippy from April 2015 to late 2018/early 2019.

67.    Young, under Kuhn's, Del Sontro's, and Taylor's direction, violated Franchisees' exclusive territorial rights by  running  the clandestine program referring moves to specified franchisees and third parties to handle ZipMoves and Relos in other Franchisees' exclusive territories.

## I.   John and Jane Does 1-10

68.    JDoes participated in and aided and abetted the tortious interference, frauds and RICO violations set forth in this demand.  They may include individuals mentioned in the Demand, but for whom Pearson does not yet have sufficient information to name them as Respondents at this point.  Pearson asked Zippy to provide documents and information that would allow him to determine all proper respondents, but Zippy refused to do so.  Pearson reserves the right, following discovery, to add respondents within this classification of individuals.

## II.    The fraudulent schemes

69.    This section sets out Respondents' fraudulent schemes and predicate acts supporting Pearson's fraud and RICO claims.  These include the (A) fraudulent pro forma scheme; (B) fraudulent concealment of revocation of operating authority; (C) fraudulent lack of operating authority; (D) fraudulent advice as to proper operating authority; (E) the Clandestine Operation; and (F) fraudulent projection of ZipMove growth.

### A.  The fraudulent pro forma scheme

#### (i)    History of the FTC Rule's effort to proscribe fraud

70.    In the 1950's and 60's, franchising began to grow as a business model, but was subject to widespread fraud and abuse.  Federal and state regulators began to investigate and study franchising to determine whether regulation was appropriate.

71.    In 1979, the FTC adopted the Rule governing the sale of franchises (16 CFR Part 436), which was generally modeled on the Securities and Exchange Commission Act of 1933.

72.    In its statement regarding the basic purpose of the Rule, the FTC found two primary areas of unfair and deceptive practices relevant to this Complaint:

> a.  Misrepresentations about the franchisor, its business format, and profitability; and

> b.  Unsubstantiated claims on profitability.

73.    To remedy the deceptive and unfair practices plaguing the industry, the FTC adopted the Rule, which requires franchisors to provide prospective franchisees with a disclosure document then called a Uniform Franchise Offering Circular, and now known under the Rule as amended in 2007 (the "**Amended Rule**") as a Franchise Disclosure Document **("FDD")**.

74.    The Amended Rule requires franchisors to disclose 23 "items," or categories, of information in an FDD, which must be given to prospective franchisees.

75.    Item 19 governs Financial Performance Representations ("**FPRs**"), which are "information about the actual or potential financial performance of its franchised... outlets...." If franchisors choose to make FPRs in their FDD, the Amended Rule, Item 19(3), places detailed requirements on how the information is presented to make sure it is a fair representation, including:

i.    The particular share of characteristics of that subset, such as the degree of competition and the length of time the outlets have operated.

ii.    The dates when the performance was achieved.

iii.    The total number of outlets that existed in the relevant period.

iv.    The number of outlets whose actual performance data were used in arriving at the representation.

v.    The number or percent of these outlets that met or surpassed the stated results.

vi.    That the prospective franchisee's performance may differ from the reported results.

76.    By imposing these strict requirements on FPRs, the Amended Rule prevents franchisors from making deceptive representations about average performance numbers without giving the basis of the calculation. Franchisors are also required to keep the documentation that supports their calculation of FPRs.

77.    The Amended Rule provides that if a franchisor does not provide FPRs in its FDD, it is forbidden to provide them orally or writing to franchisees. (Item 19(2).)

78.    Zippy has never provided FPRS in Item 19 of its FDD. Instead, to induce prospective franchisees to sign franchise agreements, Zippy brazenly flouted Item 19 by providing grossly-inflated pro formas to prospective franchisees outside of the FDD.

## (ii)    The fraudulent pro formas

79.    Taylor prepared the first pro forma in 2010. He appears to have used growth projections for storage based on growth numbers in the long-term self-storage industry. Zippy knew that the long-term self-storage industry was a different business model from the mobile-storage industry. Customers tended to keep their storage in long-term self-storage for years and the business was not as seasonal or closely tied to moving. With mobile storage, parties regularly keep their goods in storage for far shorter periods of time resulting in high turnover, and the business is seasonal with peak demand in the summer-moving season. Thus by using the long-term model, Zippy gave prospects significantly inflated numbers as to what they could expect in terms of revenue and growth.

80.    Zippy also knew that its numbers were highly inflated because no Franchisee ever achieved that level of growth, and most of them didn't even make enough net profit to pay themselves.  Further, every Zippy corporate unit either lost money or had minimal profits and would eventually all close. But Zippy failed to adjust the pro formas to reflect what they knew would be reasonably-accurate projections based on past performance.

81.    Based on an analysis of pro formas that Zippy provided to Franchisees, the projected revenue numbers are four to eight times the actual averages achieved by the Franchisees, and more than double the revenues of the few highest-performing Franchisees.

82.    Zippy also fraudulently inflated the average price per month for storage. Zippy knew actual numbers because it regularly monitored and published competitor pricing, but failed to use those numbers in the pro formas it gave to prospects.

83.    Starting in 2017, Zippy added to pro formas significantly inflated numbers regarding ZipMoves per month, but did not adjust or remove any of its already-inflated projections.  This distorted even further the likely results a prospect could achieve.

84.    Had Zippy prepared FPRs by the FDD guidelines, the FPRs would have likely shown that all the corporate units and any Franchisee below the top 10% of Franchisees were losing money.

85.    Zippy's general pattern in using the pro formas was that it would provide pro formas to prospects as part of selling webinars and then would work on them with the prospect on what is known as VIP Day, which is when prospects come to Zippy's headquarters to spend the day and learn about Zippy.

86.    Prospective franchisees would have no basis for analyzing whether the pro formas were reasonably-based.  The prospects generally assumed that the franchisor, a large, sophisticated company with executive leadership from the mobile storage industry, including PODS, was being truthful and was not conducting a brazen fraudulent scheme.

87.    Usually Del Sontro or Taylor, at times with the assistance of Scott and JDoes, would present the pro forma to the prospect at VIP Day and would review the pro forma in detail to show the prospect how much he could expect to profit from the franchise.    Zippy, Del Sontro, Taylor, Scott and JDoes caused interstate wire communications to be used to send pro formas to the Franchisees, including Pearson.

88.    Zippy created the pro formas by prepopulating them with inputs in the Input Data tab.  Examples of these include initial cost of equipment and territory, warehouse cost and utilization, financing assumptions (if used), growth projection, and equipment needs projections.

89.    The most misleading projections were in revenue growth.  Three units

were materially inflated:  net growth in storage customers per month, average length of storage, and average storage revenue per customer.

90.    Zippy would then roll these inputs into monthly and annual projections in a separate tab.  The key number for selling was EBITDA, which is one measure of net profit showing earnings before interest, taxes, depreciation, and amortization.  The pro formas would show EBITDA steadily growing over four to six years to the point the profit level was stabilized.  While this may have been a reasonable projection for a long-term self-storage model, it far surpassed anything a mobile-storage franchise could come close to achieving.

91.    The impact of the fraud was magnified by Zippy's representing to prospects, in multiple pieces of marketing literature and orally, that franchisees would be able to sell their businesses at multiples of twelve times EBITDA.  The marketing material (the "**Marketing Material**") included the following:

    a.  Introduction to the Zippy Shell Business (2013), a slick, color 31-page brochure describing Zippy Shell and the profitability of the self-storage market.   At page 20, it showed this chart demonstrating that self-storage businesses sell at 12 times owners' income, rather than 2 times for other businesses:



b. Memorandum of Information (2014), a slick, color 27-page marketing brochure filled with data and graphs to demonstrate the profitability of the self-storage business.  At page 14 of the Memorandum, Zippy represents that self-storage businesses should sell at 12 times operating income:

As a small business, self-storage businesses sell for high valuations.  The average self-storage facility, generally around 489 units, sold for roughly 12x operating income in 2010.  Compared this to typical small businesses, self-storage is a pathway to significant asset value.

c. Memorandum of Information (2016), a slick, color 22-page brochure describing Zippy Shell and the profitability of the self-storage market and ZipMoves.   At page 14, it states that a typical self-storage facility sold for roughly 12x more than its operating income in 2010.  "Compared to other small businesses, self-storage is a pathway to significant asset value."

d. Zippy, Kuhns, Del Sontro, Taylor, Scott and JDoes caused the US mails and interstate wire communications to be used to send these marketing materials to the Franchisees, including Pearson.

92.    The fraudulent pro formas not only induced prospects to become franchisees.  They also induced Franchisees to obtain larger warehouse space and purchase more equipment than they needed, driving up their initial outlay and financing costs, and their subsequent royalties, which turned on their number of containers.

93.    Del Sontro, Taylor, Scott, and JDoes knew and discussed openly among themselves (but without informing prospective franchisees) that the pro formas were significantly inflated and fraudulent, and that providing pro formas to prospects clearly violated the Amended Rule.  Nonetheless, they persisted.

## B. Fraudulent concealment of revocation of household goods operating authority

94.    From 2009 to June 12, 2013, Zippy transported household goods through its corporate units, but lacked the household goods common carrier authority to transport household goods.

95.    Zippy fraudulently concealed that failing from prospective franchisees, who would not have joined the system had they known it, and from Franchisees, whose own licenses and insurance were jeopardized by Zippy's loss of operating authority.

## C. Fraudulent concealment of lack of brokerage authority

96.    On November 16, 2015, the DOT revoked Zippy's household goods broker

authority and property broker authority, and did not reinstate it until December 4, 2016.

97.      On June 5, 2018, the DOT revoked Zippy's household goods broker authority and property broker authority, and did not reinstate it until October 2, 2018.

98.      Zippy fraudulently concealed those failings from prospective franchisees, who would not have joined the system had they known them, and from Franchisees, whose own licenses and insurance were jeopardized by Zippy' loss of operating authority.

### D. Fraudulent advice as to operating authority

99.      Zippy's logistics operations manual (the "**Manual**") advised Franchisees on the operating authority they should acquire to operate as a Franchisee.  Paragraph 4.4.2 of the manual, page 53, provides "Before you are able to start making deliveries, you will need to register for a USDOT number through the Department of Transportation as a Non-Hazmat intrastate (NOT interstate) carrier of *common goods*." (italics added)

100.    This directive was apparently based on the exception for carriers that transport contained household goods, but who provide no labor.  That, however, isn't the delivery model that Zippy required Franchisees to follow.  Zippy required Franchisees to offer labor for packing, loading, and unloading.  Based on this, Zippy knew that Franchisees were required to obtain *household goods* authority, but wrongfully advised them to obtain common goods authority.

101.    Zippy knew that household goods authority was required—all its corporate units (after June 2013) had household goods authority.  Zippy fraudulently misrepresented this requirement because it would have taken Franchisees much longer to obtain household goods authority than it did to obtain common goods authority, and Zippy wanted to generate revenue as soon as possible.  Further, operating under household good authority is more expensive because Franchisees would need detailed paperwork like inventories, valuations, and audits, as opposed to a simple bill of lading for common goods deliveries.  Zippy knew that Franchises would be even less profitable if they were forced to operate lawfully by obtaining the household goods authority.

102.    Soon after DOT revoked Zippy's household goods broker and property broker authority in 2018, Zippy concluded that it faced too much risk to allow Franchisees to operate under the wrong operating authority that Zippy had directed them to obtain.  So in an e-mail dated September 25, 2018 (about one week before DOT reinstated Zippy's brokerage authority), and without any explanation as to why it was doing so or why it was necessary, Zippy offered Franchisees the assistance of an expert to help the Franchisees obtain household goods authority.  Following this e-mail, Zippy dropped this project, continuing to leave Franchisees exposed.

103.    Pearson was a victim of this deception, having operated the first year of his franchise with common goods authority, unaware that he was at constant risk of being shut down and sanctioned, and that he had put his insurance completely at risk.  Zippy,

Kuhns, Taylor, Del Sontro, and JDoes caused the US mails and interstate wire communications to be used to send manuals and other misleading communications on operating authority to the Franchisees, including Pearson.

### E.  The Clandestine Operation

104.    As part of the ZipMove and Relo programs, Zippy made the Referral Guaranty to eligible Franchisees, representing that Zippy would provide local qualifying Franchisees the preferred opportunity to handle origin and destination for all ZipMoves and Relos.

105.    Zippy knew this representation was false.  As a regular part of its business, Zippy operated the Clandestine Operation, which referred ZipMoves and Relos to certain Franchisees and third parties in qualified Franchisees' territories where the Franchisees could have handled the moves.  Zippy concealed this from Franchisees. When a Franchisee would learn of another Franchisee handling a move in the local Franchisee's territory and alerted Zippy, Zippy would explain it away as a glitch.  Kuhns, Young, and JDoes caused interstate wire communications to be used to send bidding and like deal information to the franchisees and third parties who participated in the Clandestine Operation and in trying to whitewash it to Franchisees.

### F.  Fraudulent projection of ZipMove growth

106.    Kuhns, Scott and JDoes sent fraudulent projections of ZipMove growth to Franchisees in the spring of 2018 to induce the Franchisees to buy equipment and make other decisions that would benefit Zippy but hurt the Franchisees.  Zippy, Kuhns, Scott, and JDoes caused interstate wire communications to be used to send these fraudulent projections and communications to the Franchisees, including Pearson.

107.    At the time Kuhns and Scott were sending these communications, they knew they were false because Zippy was sending ZipMoves and Relos through their Clandestine Operation, and Zippy was planning to merge with Pack-Rat and begin sending ZipMoves and Relos through Pack-Rat's national network.

### G.  Other frauds subject to discovery

108.    Zippy regularly omitted from Exhibit F of its FDDs the name of existing or terminated Franchisees who may have dissuaded prospective franchisees from becoming Franchisees.

109.    On information and belief, Taylor had a concealed direct or indirect economic interest in the containers or other equipment that Franchisees purchased.

110.    On information and belief, Zippy used its fraudulent pro formas as part of a scheme to obtain SBA guarantees for Franchisees.  Zippy worked with First Financial, which is currently the subject of two Senate requests for investigation for similar conduct in connection with other franchises.  Del Sontro and Robin Ashwood

("Ashwood"), who was Director of Operations for Zippy, worked closely with Dan Pace of First Financial on obtaining the SBA guarantees.

111.    Ashwood is Del Sontro's sister, and was Manager of Operations for RDF from 2007-2010.  As Director of Operations for Zippy, she was the main contact for Franchisees, and was involved in a number of the fraudulent schemes, though Pearson needs further discovery to determine whether her conduct was tortious.

### III.    Pearson becomes a franchisee through fraudulent marketing materials, FDD, and pro formas

#### A.  Zippy's fraud through signing of the franchise agreement

112.    Before becoming a Zippy franchisee, Pearson was owned one of the largest bus and transportation companies in the Intermountain West.  The business was sold in 2015 and John began looking for a new business opportunity in the fall of 2015.  John found Zippy Shell online on a website promoting franchise companies.

113.    Zippy sent Pearson marketing pieces and e-mails, including the Marketing Materials.

114.    Based on the Marketing Materials and other marketing communications, Pearson became interested in Zippy, and started exploring an exclusive territory for the Greater Mobile, Alabama area, which was Mobile and Baldwin Counties.

115.    In 2015, Zippy disclosed Pearson with its FDD.  Item 12 described the territories that Zippy sells as "exclusive."  Under FTC guidance for Item 12, the term *exclusive* is so potentially misleading that the FTC took the extraordinary step (later amplified in Amended Rule FAQs 25 and 37) to prohibit use of the term *exclusive* unless the franchisee's territory would be fully exclusive, meaning that the franchisor does not reserve any rights in the territory to compete in any way.

116.    Zippy's FDD deliberately flouted that rule by describing the territories it offered as exclusive, even though Item 12 explained that Zippy reserved a series of exceptions to exclusivity, including the right to "acquire other businesses... in which case the exclusivity provisions described above will not apply to the acquired business."

117.    Zippy's FDD concealed that it had operated a number of years as a carrier without proper household goods authority, and that the DOT had twice revoked its brokerage authority for extended periods of time.

118.    At Zippy's Discovery Day on December 8, 2015, Pearson spent a good deal of time working with Rick Del Sontro in developing pro formas using Zippy's expense and revenue models.  The numbers Zippy provided to Pearson were fraudulently deceptive as described above in § II.A.ii.

119.    Following discovery day, Del Sontro finished up the pro formas and sent them to Pearson on December 8, 2015.

120.    The pro forma that Zippy gave Pearson was built as described in the prior section.  It forecasted Pearson's EBITDA as follows:

| Year | EBITDA (thousands, rounded) |
|------|------------------------------|
| 1 | (64) |
| 2 | 93 |
| 3 | 284 |
| 4 | 492 |
| Stabilized | 701 |

## B.  The Franchise Agreement

121.    Based on the fraudulent FDD, pro formas, and Marketing Material, Pearson signed his franchise agreement and a first addendum (together, the "**Franchise Agreement**") on December 29, 2015.

122.    Section 2.3 of the Franchise Agreement provided that Pearson's territory was exclusive.   Yet section 2.4 contradicts this with a number of exceptions, including the exception in 2.4(g) reserving the right to "acquire other businesses…, in which case the exclusivity provisions of Section 2.3 shall not apply to the acquired business." (the "Acquisition Exception")

123.    Section 13.7 provides that, if there is a legal dispute, fees are awarded to the prevailing party.

## C.  Zippy's fraud through Pearson's first year of business leading to a new addendum

124.    Pearson opened in March 2016.  From the start of his business, Pearson incurred sizable losses.  The amount of the losses was a significant departure from the projections in the pro formas, but Zippy assured him that turning to profitability was simply a matter of time, and concealed from him that his pro formas had been fraudulently inflated and that Zippy was planning to merge with Pack-Rat to become a consolidated business with company owned and operated units

125.    Also in March, 2018, Scott sent an e-mail to all Franchisees projecting significant growth in ZipMoves and Relos, and encouraging Franchisees to buy more equipment to be capable of handling the new load.

126.    At the same time, Mark Kuhns sent e-mails to Franchisees encouraging them to buy specially-designed box trucks that could haul a Zippy trailer, thereby providing twice the capacity and giving Franchisees the capacity to qualify to haul larger

loads. Kuhns also put out a video on You Tube to franchisees urging them to buy the box truck.

127.    Additionally, in March 2018, Zippy hosted two separate Move Certification Training Programs, one at Zippy headquarters in Washington DC and the other in Tampa hosted at Luigi's warehouse. Franchisees were required to attend one of the two sessions. These meetings were intended to prepare Franchisees for the rush of upcoming ZipMove business through training sessions, review of new policy handbooks, and in-depth discussion of the 2018 SOP.

128.    Most Franchisees attended the Tampa Move Certification Training Program. During the session, Zippy invited Franchisees for a separate tour and presentations at the greatly expanded Zippy Tampa call center. These presentations showcased new initiatives and significant investments Zippy was making, apparently, to support and grow the franchise network.   Zippy had hired key managers to oversee growth in critical areas, such as sales and customer service, IT, and marketing. The new management team presented to the franchisees:

      a.  Call center, sales team, and customer service improvements, training, and expanded capacity;

      b.  Newly developed and unified IT system for managing sales, billing, and operations. The new system, called ZForce, was to be live for ZipMoves before the summer move season and rolled out to the Franchisees in the latter parts of 2018;

      c.  Marketing initiatives, in-house marketing services, and eCommerce/online booking platforms;

      d.  Young presented about logistical and freight enhancements to meet the expected growth in ZipMoves and Relos for summer 2018.

129.    Scott's and Kuhn's projections and promises were intentionally deceptive. Neither Scott nor Kuhns conveyed to Pearson or the other Franchisees that Zippy planned to merge with Pack-Rat, which would refer the ZipMoves and Relos to Pack-Rat corporate units.

**IV.    Virgo and Zippy develop the merger plan to create a consolidated Zippy/Pack-Rat corporate unit company, undermining and eliminating the Franchisees, and execute the plan.**

    **A. To generate target economic return, Zippy and Virgo decide to abandon Zippy's franchise model and merge with Pack-Rat.**

130.    In 2017, the year when Zippy was persuading Pearson to become a franchisee, Zippy had $262,000 of profit on $16.4 million in revenues. Virgo's investment had been a bust, and it realized it needed to radically change course from Zippy's failing franchise-model business.

131.    With its investment in Zippy generating weak returns, Virgo turned to its strategy of exploiting market dislocations and inefficiencies. The strategy it arrived at was to (i) combine Pack-Rat's better-known brand name, wider footprint and significantly larger capacity with Zippy's operational efficiencies; (ii) eliminate Zippy's operational support to Franchisees; and (iii) use the more company-profitable Pack-Rat company-owned and –operated units to service ZipMoves and Relos rather than using Franchisees, who Zippy would have to share profit with.

132.    By February 2018, Virgo had issued a prospectus (the "**Prospectus**") to raise $125 million for Zippy to acquire and merge with Pack-Rat. The Prospectus was based on a signed letter of intent. Given the complexity of the deal and the detailed logistical planning, talks had been occurring since probably mid-2017.

133.    According to the Prospectus, Virgo (and Zippy) engaged industry consultants to do (i) the initial site work for the new Pack Rat operations center, which would eliminate the Zippy center and (ii) the initial integration and synergies planning. (Prospectus, p. 4)

134.    Virgo and Zippy did not structure the deal as the acquisition of a second company that would be operated independently in the same line of business. Instead, Virgo's and Zippy's aim was a complete merger.

### B. To create a consolidated corporate-unit model Virgo and Zippy plan to transfer all the Franchisees' competitive advantage to the Pack-Rat corporate units.

135.    As part of the merger, Virgo and Zippy committed to providing Pack-Rat units the competitive advantages that Zippy franchisees had held over Pack-Rat units. (Prospectus, p. 31)  New Zippy would offer a "one-stop-shop" suite of services. (*Id*, p. 5)

136.    Eliminating Zippy's operational support and providing Zippy's service efficiencies to Pack-Rat aimed to achieve synergies of over $20 million, with projected savings to Pack-Rat of $4.8 million in 2019 and $7.3 million in 2020 "by utilizing the more efficient Zippy Shell long distance moving program." (*Id*, p. 27)

137.    Virgo also forecasted that Pack-Rat would average a savings of $450 in gross profit per move by reducing its cost per mile from $0.91 to $0.61 (about a 33% savings) (id. pp. 10, 22), eliminating the Zippy franchisees' competitive advantage against Pack-Rat, a doubly-harmful loss to the Franchisees because they, unlike Pack-Rat corporate units, pay monthly franchise fees.

138.    By eliminating the administrative support for Franchisees, Virgo

forecasted that New Zippy would save $350 or more per average move, all of which savings would benefit New Zippy's profitability. (*Id*, p. 22) None of the savings would be passed on to the Franchisees, and the Franchisees would lose virtually their entire corporate support team.

139.    Pack-Rat had units in almost every territory that Franchisees had units, including Pearson's.   This meant that Franchisees went from (i) having an exclusive territory with a 33% cost advantage against Pack-Rat to a non-exclusive territory where Pack-Rat had all of the Franchisees' efficiencies, but didn't need to pay royalties as the Franchisees did; and (ii) being designated as the beneficiary of all ZipMoves and Relos in their exclusive territory to where the Pack-Rats in their exclusive territories could become the preferred service provider.

140.    Virgo's plan was to shift New Zippy to primarily a Pack-Rat model with company-owned-and–operated units  to compete against PODS, which is a franchisee model.  Virgo's Prospectus explicitly called out the deficiencies in the franchise model for this industry, which "limit[s] corporate control and ability to effectively implement initiatives." (*Id*, p. 24).  Virgo's Prospectus lays out a full page of disadvantages of a franchisee-based system and explains why New Zippy's new corporate-unit model will be significantly more efficient, profitable, and successful. (*Id*.)

141.    At the time of the Prospectus, Virgo and Zippy had started to close the Zippy corporate units and expected to complete that by late 2018 or early 2019.  They planned to transfer the corporate locations' business to the Pack-Rat in that location.

142.    Virgo and Zippy had also already started to dismantle the franchise system as well.  In March, 2018, Zippy terminated Del Sontro and a number of franchise support personnel without any explanation.   Zippy began delaying payments to Franchisees so as to conserve cash for consummating the Merger.

143.    The closure of the corporate units also contributed to undermining the franchise system and creating the pathway to a Pack-Rat corporate unit system.  A core element of Zippy's marketing was that its trailers were branded, which Zippy touted as "moving billboards."  This ended in every location when they eliminated their corporate units.  Further, since Pack-Rats didn't provide labor, Zippy reduced the footprint of its labor-providing system by closing the corporate units.   Finally, the closings and terminations was clear recognition that the Zippy model of moving and mobile storage could not survive if there was a local Pack-Rat that would have all of the Zippy economies as a result of the equipment and technology transfer.

## C. The merger announcement and the general initial implementation

144.    While Virgo's and Zippy's merger plan, as laid out in the Prospectus, was geared to undermining and ultimately eliminating the franchise system, Virgo and Zippy hid that from the Franchisees.

145.    On a June 5, 2018 phone call from Mark Kuhns, without any previous notice, franchisees learned that Zippy had merged with Pack-Rat.  Rather than disclose Zippy's and Virgo's actual plans as set forth in the Prospectus to create a consolidated Pack-Rat company-unit company, Kuhns deceived the Franchisees.  He told them that Zippy and Pack-Rat were linear brands that would continue to operate independently. Pack Rat would remain focused on commercial business, with Zippy focusing on residential.  He said that Pack-Rat generates over 100,000 residential leads that it had sold to third parties, but that would now be referred to the Franchisees.  (This never happened.)

146.    The Virgo press release announcing the merger, issued the following day, said little about the merger other than that management would consolidate and that Zippy Shell's long-distance moving program would benefit by expanding the network beyond Zippy's 47 locations to include new territories where there were Pack-Rat locations but no Franchisees.

147.    The next the franchisees heard on the merger was in Zippy's September 18, 2018 merger integration update from Mark Kuhns to Zippy employees, Franchisees, and investors.  Zippy highlighted the consolidation of the back-end operating platform, and stressed the goals of reducing corporate overhead and expenses and combining the companies' marketing dollars in "a more efficient manner to build both brands."

148.    Virgo and Zippy were portraying the merger to the franchisees as a win-win situation with lower overhead, better support, enhanced marketing, and a more comprehensive ZipMove and Relo program, which would attract more moves.    The Franchisees had no knowledge of Virgo's and Zippy's true plan, set out in the Prospectus, to create a consolidated Pack-Rat corporate-unit company, close all Zippy corporate units, and do away with supporting the franchise model.

149.    Mark Kuhns' September 18 letter to the Franchisees specifically deceived the franchisees as to their plan to consolidate the Zippy call centers into the Pack-Rat center.  Virgo, Zippy, and Pack Rat planned to eliminate Zippy's call center and support. Yet Kuhns wrote:

> Call Center Savings / Efficiency: Today, we operate two call centers located in Tampa, FL and Wake Forest, NC. The centers operate very differently – Tampa for example, operates as an "Outbound" sales center where consumer leads are followed up on by an outbound phone call, text, or email. Wake Forest, on the other hand, operates predominately as an "Inbound" sales center where consumers are encouraged to dial 1-800- PACK-RAT to book orders. Each operation has its strengths and weaknesses but the combination of both Inbound / Outbound is powerful. As a result, we will continue to operate both centers.

### D. Addendum 3, the 2019 SOP, and Pearson's closing the business

150.    Through 2018, Pearson continued to lose money in his business, and his volume of ZipMoves failed to increase as Scott had projected.  Pearson's losses were mounting.  In October 2018, Pearson traveled to headquarters to see if they would buy him out.  New Zippy continued to tell him that it was simply a matter of timing before he became profitable and began to reap all the benefits that would come from the Merger.

151.    On December 5, 2018, Mark Kuhns sent a letter to the Franchisees that for the first time suggested that Zippy might be seeking to undermine the franchise system by referring ZipMoves and Relos to Pack-Rats and third parties in the Franchisees' exclusive territory.   (At this point, they had been unaware of the Clandestine Operation.  He wrote:

> Effective January 1, 2019 we will begin directing O&D (origin & destination) service of certain LDM (long-distance) moves to the most cost-effective solution, which in some cases will be 1-800-Pack-Rat and in other cases Zippy Shell Franchise locations or third parties.

152.    On December 19, 2018, New Zippy distributed its proposed 2019 SOP.  Kuhn's letter and the proposed SOP generated a good deal of confusion among the Franchisees.   New Zippy scheduled a call for late December to answer those questions, but it turned out to be useless.  Kuhns and Taylor didn't even bother to join the call, and Rob Lekites conducted it from his car phone on a ride home.  Much of the time the reception was garbled.   And when it wasn't garbled, Lekites couldn't answer the questions.   Franchisees then forwarded written questions to Kuhns, demanding answers, including how New Zippy planned to run ZipMoves and Relos.   Zippy's management continued to try to assure the franchisees that there would be significant benefits to the Merger that would outweigh any potential downside.

153.    New Zippy rescheduled the call to explain the 2019 SOP for January 10, 2019.  In that call, Kuhns explained that Zippy was (i) opening the ZipMove and Relo programs to all of Pack-Rats' 71 corporate units, and that moves would be sent to the unit that could handle the move most efficiently;  (ii) slashing the reimbursement to Franchisees on the ZipMoves and Relos (roughly 50-60% for origin and destination), and (iii) eliminating centralized labor from the program, which was a profitable area for Franchisees and one that gave them a competitive advantage against Pack-Rat because Pack-Rat locations wouldn't provide labor; (iv) Franchisees would handle claims, whereas Zippy had handled them on a centralized basis before; and (v) Franchisees would need to sign a general release to participate in the ZipMoves and Relos.

154.    The reaction among the Franchisees was shock as each element of the change essentially eliminated Franchisees from the programs:

a. Beginning in 2013, ZipMoves and Relos had become the primary source of revenue in Zippy Moving and Storage. Now, New Zippy had essentially stripped the Franchisees from the program. Pack-Rat had corporate units in almost all the Franchisees' territories. New Zippy could profit more by having corporate units handle the moves, especially since Zippy had transferred its moving platform to Pack-Rat with the 33% reduction in cost. Further, Pack-Rat corporate units didn't have to pay any royalties or other franchise fees, making their costs significantly below those of Franchisees, and allowing them to be profitable at lower reimbursement. Zippy had slashed reimbursement rates so low that Franchisees could barely profit, if at all, from doing the moves.

b. Shifting the burden of being responsible for claims in moves placed Franchisees in an impossible position where they couldn't control their risk and would face an unduly onerous and unfair burden. This is because ZipMoves and Relos that Zippy referred to Franchisees usually involved the origin Franchisee, the common carrier, and the destination Franchisee. There would be no way for a Franchisee to figure out who caused damage to goods for which customers were seeking reimbursement. New Zippy sought to shift this burden to Franchisees because it had poorly designed and implemented the system, and wanted to shed the responsibility for handling claims and any ultimate liability for them. Additionally, Zippy had had disastrous claims experiences with its poor implementation of and attempts to make more profit through the Clandestine Operation, which resulted in extraordinarily high claims and a torrent of bad reviews. New Zippy sought to shift responsibility to the Franchisees even though New Zippy had to coordinate the origination, the third-party carrier, and the destination, and only New Zippy had the information and relationships to determine the source of any damage.

c. The change eliminating labor removed the one advantage Franchisees had over Pack-Rat units, which didn't provide labor. It also struck at the expense side of Franchisees, who had employees on payroll to provide the labor for moves. What the Franchisees didn't know at the time was that New Zippy needed to eliminate labor to cover for the deliberately erroneous advice they had provided Franchisees to obtain only common goods authority. Since the system provided labor, however, they needed household goods authority. New Zippy tried to cut off that risk by eliminating labor from the ZipMove and Relo moves.

d. New Zippy sought the release to exonerate it of the years of breaches and fraudulent conduct it had taken against the Franchisees. In seeking the release, New Zippy didn't disclose its prior breaches and

fraudulent conduct.

155.    The Franchisees were still unaware that this had been Virgo's and Zippy's plan all along as set forth in the Prospectus.  They soon put together, though, the proposed changes in the 2019 SOP with other changes that had occurred since the Merger and realized that New Zippy aimed to undermine the Franchisees and lead to the development of a company-unit business.  Contrary to all of Zippy's promises about the merger being a win-win, it now became clear to the Franchisees that:

    a.    New Zippy had promised originally to run two call centers.  New Zippy then gradually changed that to say that Pack-Rat's call center would provide support to Franchisees.  In doing so, New Zippy had in stages completely shut down the Franchisees' support staff (call center, marketing, operations, graphic designers, etc.) that had worked with the Franchisees for years and knew their businesses.  New Zippy let the support staff go without notice to the Franchisees, leaving Franchisees scrambling when issues arose only to learn that the support staff had been fired.  New Zippy shifted call-center support to two Zippy-dedicated call staff working part-time from home along with Pack Rat's dedicated support system, but the Pack-Rat support staff systematically favored Pack-Rat locations in any territory in which they overlapped with a Franchisee.  This was true even of leads that came in as Zippy-specific leads.  The two part-time Zippy staffers were inadequate to support the Franchisees.  (What the Franchisees didn't know is that this consolidation had been the plan all along as set forth in the Prospectus.)

    b.    Not only was the call center forwarding the leads to Pack-Rats, New Zippy had transferred Zippy equipment to the Pack-Rat units and trained them in using the equipment.

    c.    Because Zippy transferred its operational efficiencies to Pack-Rat locations, which didn't have to pay franchisee fees, Pack-Rats could systematically undercut Franchisees in any bid, yet stay profitable.

    d.    New Zippy's new marketing was focused almost solely on Pack Rat.  This became abundantly clear when New Zippy issued its first advertising TV commercial that it told the Franchisees was a commercial to promote both Pack-Rat and Zippy.  The entire commercial—video and audio—was about moving and storage with Pack Rat.  There was no mention of who Zippy is or what it does.  Then, in the last frame, with the Pack Rat logo displayed in large bold type across the screen, the Zippy logo is tucked away in the corner, and the voice-over mentions that consumers should call the 1-800-Pack-Rat number if they want to move with Zippy.

e. It was now clear to all that Mark Kuhn's projection of two lines of business continuing to run side by side had been a massive lie. The plan all along had been consolidation into a Pack-Rat company-unit business, and New Zippy had engineered just that in the eight months since the Merger.

156.    Zippy's franchisees were in revolt. Virgo and New Zippy realized that a sudden break would destroy their gradual plan to transition to a company-unit only business. So they reissued the 2019 SOP raising lowering the amount of the discounts, restoring labor, and removing the release. They did restate, however, that they had the full right to send any ZipMoves or Relos to Pack-Rat company units.

157.    The changes lessened the damage done, but the Franchisees had by this time realized that the franchise system had been undermined and would no longer continue.

158.    Acknowledging this, Zippy soon rolled out a program allowing Franchisees to terminate their franchise agreements, receive some consideration, and convert to become licensees of Zippy and junior contractors of Pack-Rat.

159.    Pearson soon recognized that Zippy had destroyed its franchise model, and Zippy soon told him that it was shutting down its Relo program. By May, 2019, Pearson realized he could no longer make money in his business and gave notice to Zippy that he was winding down his business after close of the summer season.

160.    Since February, 2019, all but three franchises have closed or converted to licensees. (The three remaining franchises will either convert or close soon.) The franchise system is done.

161.    Pearson lost close to $1.1 million from his Zippy franchise. Had Pearson taken a job in his profession rather than buy the Zippy franchise, he would have made about $750,000 from the beginning of the franchise through closure. His expectation damages are 12 times what the pro formas projected as stabilized EBITDA, which is over $8 million.

## **LEGAL CLAIMS**

### **Count 1:  Material breach of Pearson's right to exclusive territories**
(Zippy)

162.    Pearson restates the averments of the preceding paragraphs of this Demand.

163.    The FDD and Franchise Agreement promised Pearson an exclusive territory.

164.    Zippy materially breached Pearson's right to an exclusive territory through the Clandestine Operation and through integrating the Pack-Rat unit in Pearson's territory to be a fully competitive unit.

165.    Zippy's material breach of Pearson's right to exclusive territories resulted in damage to Pearson.

166.    Under the FTC's guidance on exclusivity, any attempt to make exceptions to exclusivity is void if the FDD promises the franchisee an exclusive territory.

167.    Zippy's FDD promised Pearson an exclusive territory.  The Acquisition Exception is void as a matter of law based on its violation of the FTC's Guidance under the Amended Rule.

168.    Further, the Acquisition Exception would apply only to an acquisition where Zippy would keep the acquired company separate and independent.  Here, Zippy merged and fully integrated with Pack-Rat, which does not fall within the exception for acquisitions.

## Count 2:  Breach of the covenant of good faith and fair dealing
(Zippy)

169.    Pearson restates the averments of the preceding paragraphs of this Demand.

170.    Zippy had discretion in how it carried out any acquisition under the Acquisition Exception.

171.    Had it exercised its discretion in good faith and with fair dealing, it would have not carried out the Merger in a way that undermined the entire franchise system and led all the Franchisees to close or convert to contractors.

172.    Zippy did not, however, show good faith and fair dealing.  In bad faith, it executed the merger so as to gut the franchise system and destroy Pearson's business.

173.    Zippy's material breach of the covenant of good faith and fair dealing resulted in damages to Pearson.

## Count 3:  Fraudulent inducement
(All Respondents)

174.    Pearson restates the averments of the preceding paragraphs of this Demand.

175.    Through the misrepresentations and omissions set forth in §§ II(A-D), Zippy, Del Sontro, Taylor and JDoes intentionally, maliciously, and fraudulently induced Pearson to sign the Franchise Agreement and to purchase a second territory.

176.    Pearson reasonably relied on their material misrepresentations, and their omissions were material.

177.    The material misrepresentations resulted in damages to Pearson.

178.    Based on this fraud, Pearson is entitled to rescind the agreements and receive damages.

179.    Through the misrepresentations and omissions set forth in §§ II(E-F), Kuhns, Young, Scott, and JDoes fraudulently induced Pearson to enter into the ZipMove and Relo SOP and purchase equipment through fraudulently concealing the Clandestine Operation and using baseless forecasts of growth at a time when Zippy knew it would be undermining and eliminating the franchise system.

180.    The material misrepresentations resulted in damages to Pearson.

181.    Pearson reasonably relied on their material misrepresentations, and their omissions were material.

182.    Based on this fraud, Pearson is entitled to receive damages.

## Count 4:  <u>Violation of Alabama Little FTC Act</u>
(All Respondents)

183.    Pearson restates the averments of the preceding paragraphs of this Demand.

184.    Zippy Shell and the individuals actively involved in deceiving him violated Ala. Code 8-19-5 (25) by using the telephone to defraud Pearson into purchasing a franchise from Zippy.  intentionally misrepresenting the prospects or chances for success of a proposed franchise in connection with selling or establishing a franchise.

185.    Zippy Shell and the active individuals involved violated Ala. Code 8-19-5 (27) by engaging in all the unconscionable, false, misleading, and deceptive acts and practices set forth in this demand.

186.    The violations of the Florida statute resulted in monetary damages to Pearson, which should be trebled under Ala. Code 8-19-10(2).

## Count 5:  <u>Violation of 18 U.S.C. § 1962(c)</u>
(All Respondents)

187.    Pearson restates the averments of preceding paragraphs of this Demand.

188.    Respondents (the "Participants") constitute an association-in-fact "enterprise" (the "Defrauding Zippy Franchisees Enterprise") as that term is defined in 18 U.S.C. § 1961(4), that engages in, and the activities of which affect, interstate commerce.  The Participants are and have been joined in a common purpose, namely to fraudulently induce prospective Zippy franchisees to become Zippy franchisees and to take other actions to Zippy's advantage by the schemes set forth in Section III of this Demand (collectively, the "Fraudulent Schemes").

189.    Although different members of the enterprise perform different roles at different times, they have operated as a continuing unit with each member fulfilling a specific and necessary role to carry out and facilitate its common purpose–the Fraudulent Schemes – with sufficient longevity to accomplish that common purpose. The Demand has spelled out the role each Participant played in the Fraudulent Schemes.  Each Participant's role and participation in the Fraudulent Schemes was necessary to the success of the scheme.  No one Participant was capable of carrying out the Fraudulent Schemes without the participation of the other Participants.

190.    Each Participant is or has been employed by and associated with the Defrauding Zippy Franchisees Enterprise.

191.    Participants have knowingly conducted and/or participated, directly or indirectly, in the conduct of the Zippy Enterprise's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud and interstate wire communications statutes, respectively 18 U.S.C. § 1341 and 1343, respectively, based upon the use of United States mails and interstate wire communication to send Franchisees the communications set forth above in the Fraudulent Schemes.

192.    Pearson has been injured in his business and property by reason of this conduct in that, among other things, he purchased the franchise that he would not have purchased absent the Fraudulent Schemes, and he is entitled to triple his damages.

## Count 6:  Violation of 18 U.S.C. § 1962(d)
### (All Respondents)

193.    Pearson restates the averments of the preceding paragraphs of this Demand.

194.    Participants have knowingly agreed and conspired to conduct and/or participate, directly or indirectly, in the conduct of the Defrauding Zippy Franchisees Enterprise's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute and interstate wire communications statutes, respectively 18 U.S.C. § 1341 and 1343,  based upon the use of the United States mails and interstate wire communication to send prospective Zippy franchisees Franchise Disclosure Documents, contract documents, fraudulent pro formas, and other fraudulent marketing materials and communications.

195.    Each of the Participants knew of, agreed to, and acted in furtherance of the common and overall objective of the conspiracy by facilitating the sending of Franchise Disclosure Documents, contract documents, fraudulent pro formas, and other fraudulent marketing materials.

196.    Pearson has been injured in its business and property by reason of this conduct in that it purchased the franchise that it would not have purchased absent the Fraudulent Schemes, and he is entitled to triple his damages.

## Count 7:  Violation of 18 U.S.C. § 1962(c)
(Del Sontro, Taylor, Scott, Kuhns, Young, and JDoes)

197.    Pearson restates the averments of the preceding paragraphs of this Demand.

198.    Zippy is a corporation and an "enterprise" (the "Zippy Enterprise"), as that term is defined in 18 U.S.C. § 1961(4), that engages in, and the activities of which affect, interstate commerce.

199.    Defendants Del Sontro, Taylor, Scott, Kuhns, Young, and JDoes (the "Individual Participants") have been employed by and/or associated with the Zippy Enterprise.

200.    The Individual Participants knowingly conducted and/or participated, directly or indirectly, in the conduct of the Zippy Enterprise's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud and interstate wire communication statutes, respectively 18 U.S.C. § 1341 and 1343, through the use of United States mails and interstate wire communications to send franchisees fraudulent communications in carrying out the Fraudulent Schemes.

201.    Pearson has been injured in his business and property by reason of this conduct in that, among other things, he purchased the franchise that he would not have purchased absent the Fraudulent Schemes, and he is entitled to triple his damages.

## Count 8:  Violation of 18 U.S.C. § 1962(d)
(Del Sontro, Taylor, Scott, Kuhns, Young, and JDoes)

202.    Pearson restates the averments of the preceding paragraphs of this Demand.

203.    Individual Respondents knowingly agreed and conspired to conduct and/or participate, directly or indirectly, in the conduct of the Zippy Enterprise's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud and interstate wire communication statutes, 18 U.S.C. § 1341 and 1343, based upon the use of the United States mails and interstate wire communications to send Zippy franchisees communications in carrying out the Fraudulent Schemes.

204.   Individual Respondents agreed to and acted in furtherance of the common and overall objective of the conspiracy by facilitating the sending of fraudulent communications to Zippy franchisees in carrying out the Fraudulent Schemes.

205.   Pearson has been injured in its business and property by reason of this conduct in that it purchased the franchise that it would not have purchased absent the Fraudulent Schemes, and he is entitled to triple his damages.


**REMEDY:**  Pearson respectfully requests against all Respondents, jointly and severally, full damages in an amount to be proved plus treble damages under RICO, exemplary, statutory and punitive damages plus his attorneys' fees and costs.

Dated:  August 30, 2021                    Respectfully submitted,


                                          */s/ Peter R. Silverman*
                                          Peter R. Silverman
                                          (psilverman@shumaker.com)
                                          SHUMAKER, LOOP & KENDRICK, LLP
                                          1000 Jackson Street
                                          Toledo, OH 43604-5573
                                          Phone: (419) 241-9000
                                          Fax: (419) 241-6894

                                          *Attorneys for Claimants*