# EXHIBIT 5

AMERICAN ARBITRATION ASSOCIATION
COMMERCIAL ARBITRATION RULES

| | |
|---|---|
| JOHN PEARSON and TENSAW INVESTMENT GROUP, LLC,<br><br>                              Claimants,<br><br>          v.<br><br>ZIPPY SHELL INCORPORATED;  1-800-PACK-RAT, LLC; MARK KUHNS; RICK DEL SONTRO; GARETH TAYLOR; DANIELLE SCOTT; JAY YOUNG; and JOHN AND JANE DOES 1-10,<br><br>                              Respondents. | Case No. 01-20-0000-5245<br><br>GENERAL DENIAL, AFFIRMATIVE DEFENSES AND COUNTERCLAIMS |

    Pursuant to Rule R-5(a) of the American Arbitration Association Commercial Arbitration Rules and Mediation Procedures, Respondents Zippy Shell, Inc. ("Zippy"), 1-800-Pack-Rat, LLC ("Pack Rat"), Mark Kuhns; Rick Del Sontro; Gareth Taylor; Danielle Scott; Jay Young (collectively, "Respondents"), by and through their attorneys, Kaufmann Gildin & Robbins LLP, as and for their Answer to the First Amended Arbitration Demand dated August 30, 2021, allege as follows:

## NARRATIVE RESPONSE

    The presentation by Claimants John Pearson and Tensaw Investment Group, LLC (collectively "Pearson") in their First Amended Arbitration Demand (the "Demand") weaves an interesting tale, but that tale is based on a fantasy that has no basis in reality. Its purpose is to create as much prejudice as possible because, if Pearson is forced to rely on facts related to his own experience, his case will be found to be completely without merit.

**I.     Factual Background and Relationship of the Parties**

    **A.   The Zippy System.**

    In 2007, Zippy's predecessor was founded in Australia to supply on-demand mobile storage, local moving service, packing, and long-distance moving. Unlike other mobile storage companies, Zippy's mobile "shell" is essentially a licensed trailer, which can be hitched to a pick-up truck. This means the shell can be parked on a street for loading without a further permit. In addition, it reduces costs for franchisees by dispensing with the need for trucks with hydraulic systems, in favor of simple pickup trucks that can tow the shells. The shells also include cages, permitting tie-down of the customer's belongings.

    In 2010, Zippy was launched in the United States, with a system of franchises and company-owned locations. Zippy was always marketed to franchisees as a "get rich slow" business, dependent on the franchisee's ability to make the necessary up-front investment for its own territory (which is different for each territory) and the patience to slowly build

the storage business.

### B. Pearson's Pre-Sale Investigation and Purchase of a Zippy Franchise.

Pearson first became interested in Zippy in or around October 2015. He told Zippy that he had recently sold his prior business and retired but had decided to "un-retire" and get into another business. He received the Franchise Disclosure Document (the "FDD") in November and ultimately signed his Franchise Agreement on December 23, 2015. During that 2-month period, Pearson had many discussions with Zippy representatives about the "get rich slow" nature of the business and the types of expenses required to open and operate the business. He told Zippy representatives that he wanted to move fast, both to sign the Franchise Agreement and to open his business (based, in part, on his understanding from speaking with existing Zippy franchisees that the business was seasonal and most active in spring).

During these busy two months, Pearson did all of the following to investigate the Zippy opportunity:

- Received and reviewed the FDD;
- Consulted with his lawyer and accountant concerning the FDD, proposed Franchise Agreement, and the System (both of whom apparently agreed with his decision to purchase the franchise);
- Spoke with at least eight (8) operating Zippy franchisees concerning their experiences in the Zippy System;
- Participated in a series of Zippy Webinars concerning various aspects of the Zippy business and System;
- Visited Zippy's headquarters in Washington D.C. for a "VIP Tour" and various informational meetings with Zippy representatives on December 7;
- Communicated with Zippy representatives concerning financing, technology platform, warehouse space and other matters;
- Received and discussed with Zippy representatives (in person and via email) a financial template, or what Pearson refers to as a "pro forma," designed to assist him in creating a business plan (discussed below)[1];
- Received and commented on a proposed Franchise Agreement and Addendum in November;
- Received and reviewed Zippy Franchisee Newsletters and Blog;
- Negotiated the waiver of an anticipated increase in Zippy fees in 2016; and,
- Discussed the ZipMove Program with Zippy representatives.

As noted, during that process, Pearson worked together with Zippy representatives on a financial template (or what Pearson refers to as a "pro forma") that referred to general categories of revenue and expenses. When provided by Zippy to Pearson, it included only basic expense information that can be derived from the form franchise agreement, and Pearson was advised to input and modify the spreadsheet based upon his own market information and business plan. [2]

---

[1] Based upon his discussions with Zippy and at least eight Zippy franchisees, Pearson acknowledged to Zippy in November 2015, more than a month before he signed the Franchise Agreement, that "profit margins [would be] very slim for the first few years."

[2] Delivering two versions of the templates to Pearson, Zippy representatives stated: "Attached is the model. As

For example, he was told that the template includes a cost line for warehouse space based upon a 5,000 SF warehouse at $6.00 per SF, but that he would decide how much warehouse space he would require (based on his Territory and projections) and would have to investigate how much it would cost in his Mobile market. Zippy made it clear it had no ability to anticipate these expenses and was including them on the template simply as an example that was not necessarily applicable to Pearson's territory. Likewise, he was told that the fees listed therein were based on the size of the territory that he chose to purchase (based on population), and how much capital he would need for equipment, personnel and operations.

At no time did anyone from Zippy make any representations to Pearson about specific costs or expected revenues because there was no way to know that information. Each of the costs attendant to operating a Zippy business differs from territory to territory and no prediction could ever be made by Zippy. This was a collaborative exercise to educate Pearson in the nature of the business so he could make his own choices. **It was not, as Pearson now claims, a pro forma designed as a representation by Zippy of how to build his business or the level of success he could expect to achieve. Pearson, a sophisticated businessman, knew that.**

Finally, with regard to the templates, to the extent the templates were representations of how he would do in the future (**which they most certainly were not),** Pearson most certainly did not follow the "script" (see discussion of warehouse square footage below, for example) and, therefore, whatever operating losses he may have incurred are not attributable to and cannot be blamed on Zippy.

Most important, Pearson had (and took advantage of) the opportunity to speak to and meet with numerous existing franchisees to "validate" what he was told by Zippy and his own conclusions, get their opinions on the nature and expenses of the business, their level of success and their satisfaction with their interaction with Zippy. He told Zippy representatives during this process that he had spoken with 8 current Zippy franchisees and was satisfied with what he learned.

On or about December 23, 2015, Pearson signed his Franchise Agreement and commenced the steps necessary to open his business (which actually opened in June 2016).

### C. Pearson's Operation of His Zippy Business.

After he signed the Franchise Agreement, Pearson began to prepare to open his business. The first thing he did was lease warehouse space. We noted above that the financial template provided by Zippy refers to a 5,000 SF warehouse (again, this depends on size of the territory and other factors). Pearson initially leased an 11,000 SF warehouse. This confirms that Pearson did not rely on the inputs or assumptions in the financial template (regardless of whether it was or was not the result of collaboration with Zippy) but made his own analysis of his market and invested in his business accordingly. The allegation that he was defrauded by misrepresentations in the financial template are

---

mentioned, you will need to modify the assumptions based on your market, operating model, etc." on November 9; and (ii) "Here is what you worked on today at the VIP Tour. You can make whatever assumptions [are] necessary for your market" on December 8.

demonstrably false.

After opening for business, Pearson, by his own account, was extraordinarily successful immediately. He told Zippy that he outgrew is 11,000 SF warehouse in 11 months and therefore moved to a 20,000 SF warehouse in September 2017.[3] He told Zippy in July 2018 that his revenues in 2018 (his second full year of operation) were projected to exceed $1M, and he expected a "decent profit" in 2018. Later in 2018, Pearson told Zippy that his business "was growing and kicking ass." And in 2019, Pearson told Zippy although he had planned to not make any profit during the first three full years of operation as a result of his decision to invest and grow the business, he was anticipating a profit in 2019, a full year ahead of schedule.

Ultimately Pearson simply decided to cease doing business because, as he advised Zippy, his wife did not want him working so hard and he had a change of heart in terms of working instead of retiring. Everything that happened in connection with Pearson ceasing his operation was the result of Pearson's own actions and was not in any way the fault of Zippy.

### D. The Zippy/Pack Rat Merger.

In June 2018, Zippy announced its acquisition of Pack Rat (which has generically been called a "merger"). The acquisition enabled Zippy, through both the Zippy Shell and Pack Rat brands, to offer a full array of moving and storage services.

Zippy and Pack Rat offer different business services and, for the most part, deal with different customer bases. In fact, only a small percentage of potential customers contact both Zippy and Pack Rat when searching for a company to handle their storage and moving needs. Pack Rat is most like PODS, its largest competitor, whereby a customer (residential or commercial) rents a large container for storage or moving purposes and keeps possession of it for an extended period of time, during which the customer handles the packing of the container. Zippy, on the other hand, is a nimbler process, which allows the customer to keep possession of the container for only 2-3 days and offers labor services to assist in packing and/or unpacking. Any potential customer who wants what Pack Rat has to offer is not likely to want Zippy and vice-versa (although sometimes potential customers contact one or the other without realizing that the one they are contacting does not offer the type of service they want). In short, Zippy customers generally seek labor services and higher convenience, faster turn solutions.

Since the acquisition, Zippy and Pack Rat have at ball times operated as two distinct brands - with one exception. In July 2018, Pack Rat started to send customer leads to Zippy for potential conversion to orders. Contrary to Pearson's claims, other than very rare one-off type of situations, at no time did Zippy refer business to Pack-Rat. There was and is no

---

[3] When boasting about his explosive growth and need for additional warehouse space within 11 months, Pearson, using some colorful language (which was not at all unusual for him), complained that Zippy representatives told him that 11,000 SF would be plenty of space for 2-3 years. Thus, Pearson acknowledged that his growth even outpaced the volume of business allegedly mentioned by Zippy representatives.

technical capability to accomplish that on more than a one-off basis.

One of Pearson's claims is that moving business that was supposed to go to him was somehow diverted by Zippy to others (among them Pack Rat), but that is not the case.  For the period of 2017-2018[4]:

    a. Pearson received 216 total moves from Zippy though Zippy's website lead system.  (He most likely did more moves, which came to him directly and not through Zippy.)
    b. Of those 216 moves, only 38 were the result of leads received by Zippy from his territory (that he was entitled to receive under the Franchise Agreement).
    c. Of those 216 moves, 179 were the result of leads received by Zippy from outside of Pearson's territory (that Zippy had no obligation to provide to him).
    d. Zippy did not provide any other Zippy franchisee or Pack Rat location with any leads that Zippy received from Pearson's territory.  (In fact, Pack Rat does not have a location in Mobile to serve such leads.)

Pearson, like many others, claimed that the acquisition was a violation by Zippy of its obligations under the Franchise Agreement. However, when faced with the reality that Zippy reserved the right, in the Franchise Agreement, to acquire another brand or be acquired by another brand, (see Franchise Agreement, sec. 2.4(g)), Pearson (like others) needed to find other claims. The result is the Demand, which is, to be charitable, factually inaccurate and legally without merit. Essentially, the Demand throws as much "stuff" against the wall as counsel could imagine and hopes something will stick. A review of the facts will show that the essence of the claims set forth in the Demand is pure fantasy.

    **E. Pearson's Requests to Sell His Zippy Business.**

In February 2018 (less than two years after opening his business), Pearson told Zippy that he had decided to sell his business.  In connection with his decision to sell, Pearson exchanged a series of candid emails with Zippy between February 5, 2018 and March 15, 2019, in which he explained his decision to sell his business, requested that Zippy purchase his business, and ultimately threatened litigation if Zippy or another buyer did not pay him the total amount that he invested in his business.

In those emails, Pearson does not blame Zippy for his decision to sell or make any of the allegations ultimately included in the Demand.  Instead, he candidly tells Zippy that his decision to sell was based on family and health concerns; that his business was exceeding his expectations; and that his decision to sell had nothing to do with Zippy.  The emails make no mention of anything Zippy did wrong, or even that Pearson had sustained losses. They merit a full reading; here are only a few excerpts (all caps in original, emphasis added):

---

[4] Pearson opened his Zippy business in June 2016 and closed in approximately fall 2019. Zippy will supplement this analysis with 2019 data, not currently available, if and when necessary.

*1. Email from Pearson to Rick Del Sontro, February 5, 2018:*

- I hope you are doing well. As I am sure you are aware, I am selling. I think there has been some miscommunication so I want to clarify some things. This will be a good email, no bitching.
- My story starts on Friday, January 26, 2018. My wife asks if we can have an hour the next day (Sat) to talk. I say yes and freak the fuck out. She has never done this before. I have no idea what she wants. I have a great marriage and love my wife very much. Does she want a divorce? Is she cheating on me? Is she leaving me? I had no idea.
- We met, and she simply started the conversation by saying that she thought it was time to sell Zippy Shell. I was shocked, not something I had considered at this point. She had obviously thought hard and long about it and had prepared a good case. **It had NOTHING to do with you or Corporate**. She simply thinks that it is wearing me out and my family and my relationship is suffering. She pointed out how much of the kids activities I miss, and she feels our relationship is suffering. I wake up tired, I am tired all day, and pass out at the end of each day. My health is suffering. I have stomach problems due to stress and now have to take medicine. My blood pressure is off. I have lost 20 pounds in 2017 and I am not trying to lose weight. I have no appetite. I don't sleep.
- Since opening, my net worth has gone up considerably. I have had some inheritance, some investments pay off and some notes mature. She pointed out I do not have to work this hard, I don't actually have to work at all. I do it because I enjoy it and I work so hard because I want to win, period! I am not a young buck anymore. You once said I was your star. The biggest and brightest stars also have the shortest life span and burn out the fastest. She did not want me to make a decision, just to think about it some and then make a decision. I did not sleep that night, and thought hard all night. I could not get that pic out of my head. How will I look in another 2 years?  Fuck.
- **In the end I decided she was right, my family, my wife and my health are more important than any business or winning.**
- I am meeting with a business broker next week and going to ask them to reach out to you to make sure we get the right buyer for you. I plan on attending move school in Tampa, I am not going to fight the new Z-link. I will work hard, even to my own detriment, to make sure my franchise continues to perform to my expectations during the sale. I was hoping my friendship with you and Robin would continue after I had sold since you were the two I was closest to at ZS. I have no plans for after my sale. I was even going to offer to work for ZS in some regard, maybe consulting or something, if I was needed. I just don't want to own a franchise anymore, but I do know the franchise side of the business pretty well and I feel I could bring a lot to the table.

2. *Email from Pearson to Mark Kuhns, July 6, 2018:*

- Let's circle around next week about opportunities and me staying on board. I will let you know where I am with it. I am on the fence. I think my franchise might crack a million in gross this year, my second full year. If not, it will be close. I think I will turn a decent profit too. I also feel I am very very good at this business. It feels like a natural fit for my personality and previous experience.
- Why am I on the fence? It is simple. People who are moving are out of their fucking minds. This is not a fun industry. You move 100 people and do a great job, 2 will say thanks. Screw up 1 move, and you will hear about it for a month. Even had a client stalk me once, actually, twice. **It is simply wearing me out. I make great money, and that can help temper all the negativity that seems inherent in this industry, but right now I am in the middle of the season and just plain tired**.
- My wife and I are starting our new business, but it can be run with us owning ZS as well. Basically, we are doing vacation and long term real estate rentals. We are planning to build our first vacation rental on Dauphin Island in August or July. This might be our only vacation rental, the rest will probably be long term rentals. It will not interfere with ZS, I can do both. It becomes whether I want to do both.
- Packrat acquisition is interesting and I am interested in hearing what opportunities might be available for me. Could make the difference if I put it back up for sale in the fall or roll up my sleeves and give it more time. If I could clear minimum 250k a year net of ZSGM, I would stay. We will see if my hard work will produce those kind of results this year. It actually might.

3. *Email from Pearson to Mark Kuhns, September 25, 2018:*

- My wife and I took the weekend to discuss things, the business, our future, etc.... I really think I want to sell. I just do not enjoy this and have some serious trust issues with Corporate. I am hoping Corp will see the value in my franchise and want to purchase it. All I want is what I have in it, not a penny more. Most franchises, like Joe Bowers, are imploding when they are for sale. **Mine is growing and kicking ass**. If I cannot sell it by the summer season, I guess I can simply shut it down and liquidate the assets. I am positive on my assets, so I can do ok this route.

4. *Email from Pearson to Mark Kuhns, March 15, 2019:*

- Anyway, on to the good stuff. We opened in June of 16. Rick and Bolin both told me my 11,000 ft warehouse would be fine for 2-3 years. Well, I outgrew it by May of 2017, 11 months after I opened, those assholes. I had to shut down storage due to the bad advice I got from them. Still pissed about that. I was in the middle of a season by the time I hit capacity and did not have time to move. I did finally move into my new 20,000 sq ft facility in Sept of 2017. Nice warehouse,

> but functional. Office, mover/driver lounge and I can stack 3 high. I can get about 250 containers in it. It is actually perfect. See pic.
>
> - **We had never really planned on making money till year 4 as we were growing like crazy, might be the fastest growing franchise in ZS history**. **Still growing like crazy, increasing gross 50% every year since opening**. Hurricane Michael offset some if us not offering storage during the summer of 2017 and helped a lot. We did a hell of a lot of Relo last year, made you probably 300k-400k in Relo moves.
>
> - Our reviews are off the charts. Almost 60 5 star on Google with a 4.8 rating. Same with other sites and social media. We have seen a change in leads, they are coming to us instead of us chasing them. We are now the preferred mover of just about every realtor in both my counties. Seems half my moves are referrals from past customers. Do a good job and the moves/storage will come and they have. **We still spend the requirement on marketing, but, really don't need too market as much anymore**. We are established and have a great reputation. I may be volatile sometimes, but I am good at this. **We should make money this year, a full year ahead of schedule.** I am good on equipment with the 6 shells, 6 trucks, 3 goosenecks and 2 bumper pulls.
>
> - Mark, I am ready to move on. I am not bitter, mad or any of the above. I just know when it is time to do something different.

F.  **Pearson Closes His Business and Files the Arbitration Demand.**

In or about May 2019, Pearson advised Zippy that he planned to close his business in late 2019 (after the busy summer season). In or about late 2019, Pearson ceased operating his business. On February 13, 2020, Pearson filed the Arbitration Demand. On August 30, 2021, Pearson filed the First Amended Demand, which added an additional RICO claim.

This cannot be stressed enough -- Pearson operated his business for less than two years before deciding to sell and in total for less than three years. **The evidence will show that Pearson was told on numerous occasions that this is a "get rich slow" business (for which building up the storage part of the business was key).**

As detailed below, due to Pearson's premature termination of the Franchise Agreement and closure of his business, he is liable to Zippy for damages in an amount estimated to exceed $500,000, including lost cartridge license fees, brand building fund fees, and call center fees payable to Zippy over the remaining term of the Franchise Agreement. Further, pursuant to the Franchise Agreement, Zippy is entitled to recover its attorneys' fees from Pearson.

II.  **Pearson's Legal Claims**

A.  **Pearson's first claim** is referred to as "Material breach of Pearson's right to exclusive territories." There are two (2) examples cited by Pearson in the Demand.

The first is the so-called "Clandestine Operation." This is a very imaginative name, but

that level of imagination should not be confused with accuracy. To put it simply, this is nonsense. Pearson is referring here to an alleged agreement made with another Zippy franchisee, ZDHF Holdings LLC ("ZDHF") to allow ZDHF to do long distance moves nationwide provided they did not originate or terminate in another franchisee's territory. That alleged agreement with ZDHF did not happen (though Zippy tried to give ZDHF as many moves as it could provided they did not infringe on the rights of any franchisee (including Pearson) and did not cause Pearson any damage. Ultimately, though nicely named, it is a claim that has no merit whatsoever.

The second example of "material breach" is the so-called merger with Pack Rat and the fact that the combined entity somehow infringed on Pearson's rights. As set forth above, no business originating or ending in Pearson's territory was ever transferred by Zippy to Pack Rat. There was and is no method of accomplishing that. But there was business that came into Pack Rat that was ultimately assigned to Zippy because Pack Rat had (and still has) a system by which that can be done. Whether or not Zippy was trying to harm its franchisees (which is, of course, complete nonsense), Pearson was not harmed in any way by the acquisition. And, as noted above, section 2.4(g) of the Franchise Agreement provides:

> 2.4  Reservation of Rights.  Except as otherwise expressly provided in this Agreement, we retain all of our rights and discretion with respect to the use of the Marks and the Zippy Shell® System anywhere else, including the right to:
>
> (g ) acquire other businesses or be acquired by another company, in which case the exclusivity provisions of Section 2.3 shall not apply to the acquired business or the acquiring company.

B. **Pearson's second claim** is for breach of the obligation of good faith and fair dealing. This claim is both factually incorrect and legally deficient.

As a factual matter, this claim depends on Zippy having known in 2015 that it would acquire Pack Rat, which was not even a consideration until late 2017. Also, Pearson suffered no damage because there was nothing about the acquisition which affected him. As a legal matter, it is black-letter law that the obligation of good faith and fair dealing cannot be invoked where there is a provision in the contract governing the issue. Sec. 2.4 of the Franchise Agreement expressly allows Zippy to "acquire other businesses or be acquired by another company, in which case the exclusivity provisions of Section 2.3 shall not apply to the acquired business or the acquiring company." This is simply another example of Pearson trying to find claims where they do not exist.

C. **Pearson's third claim** is for fraudulent inducement. The evidence will show that the "pro-forma" allegedly relied upon by Pearson was never intended to or communicated to Pearson as a representation of the financial performance he could expect. Indeed, the evidence will show that no effort was made by Pearson to operate his business in accordance with what he refers to as the "pro-forma." As a result, there could not have been the reasonable reliance required for a fraud claim.

The Demand refers to two (2) separate categories of misrepresentations. The first is those that were made pre-sale. As to those, they would seem to depend on the "pro-forma" and we have already made clear that the pro-forma was a collaborative effort designed to educate Pearson about the business and allow him to make his own computations from which he could decide for himself whether to buy the franchise. There were no representations and thus could not have been any misrepresentations. Indeed, Pearson acknowledged that there were no representations when he agreed to the following in the Franchise Agreement:

> THIS AGREEMENT CONSTITUTES THE ENTIRE AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CHANGED EXCEPT BY A WRITTEN DOCUMENTS SIGNED BY BOTH PARTIES. … {t} here are no other oral or written understandings or agreements between us and you relating to the subject matter of this Agreement.  Any representations not specifically contained in the Agreement made prior to entering into this Agreement do not survive subsequent to the Effective Date of this Agreement. … *Franchise Agreement*, 13.10(a)(all caps in original)
>
> **Representations by You:** You hereby represent as follows:
>
> (a)   YOU HAVE CONDUCTED AN INDEPENDENT INVESTIGATION OF THE BUSIENSS CONTEMPLATED BY THIS AGREEMENT AND RECOGNIZE THAT IT INVOLVES BUSINESS RISKS MAKING THE SUCCESS OF THE VENTURE LARGELY DEPENDENT UPON YOUR OWN BUSINESS ABILITIES, EFFORTS AND JUDGMENTS, AND THE SERVICES OF THOSE YOU EMPLOY, AND **YOU EXPRESSLY DISCLAIM THE MAKING OF, AND YOU ACKNOWLEDGE THAT YOU HAVE NOT RECEIVED OR RELIED UPON, ANY WARRANTY OR GUARANTEE, EXPRESS OR IMPLIED, AS TO THE POTENTIAL VOLUME, PROFITS OR SUCCESS OF THE BUSIENSS VENTURE CONTEMPLATED BY THIS AGREEMENT**.
>
> (b)   YOU HAVE NO KNOWLEDGE OF ANY REPRESENTATIONS BY US OR ANY OF OUR OFFICERS, DIRECTORS, MEMBERS, EMPLOYEES, AGENTS OR REPRESENTATIVES ABOUT THE BUSINESS CONTEMPLATED BY THIS AGREEMENT THAT ARE CONTRARY TO THE TERMS OF THIS AGREEMENT, THE FRANCHISE DISCLOSURE DOCUMENT OR THE DOCUMENTS INCORPORATED IN THIS AGREEMENT. *Franchise Agreement*, 14.2(b) (all caps in original)

The second category of misrepresentations refer to the so-called "Clandestine Operation" and the alleged "fraudulent projection of ZipMove growth" as the support for this claim. With regard to the "Clandestine Operation," there was no such thing and, even if there was, it caused no harm to Pearson. There simply was no business done by ZDHF in Pearson's territory that could have and should have been done by Pearson. Without an actual diversion of business, there

is nothing to be discussed here.

As for the alleged fraudulent projection of ZipMove growth, it boggles the mind how a claim can be made that Zippy stood to gain from this. Pearson claims that "they knew they were false because Zippy was sending ZipMoves and Relos through their Clandestine Operation…. and through Pack-Rat's national network." As set forth, neither of those allegations is true. Any projections given about expected growth of the ZipMove program were after Pearson's purchase and were made in good faith. None of the Zippy business was done by Pack-Rat and none of the business allegedly promised to ZDHF or done by ZDHF was to come from (or in fact came from) another franchisee's territory (including Pearson's).

D. **Pearson's fourth claim** alleges violation of the Alabama Little FTC Act. Since there were no unfair or deceptive acts or intentional misrepresentations, and no "unsubstantiated FPRs," this claim adds nothing worth discussing. They are denied.

E. **Pearson's fifth, sixth, seventh and eighth claims** allege that the previously pleaded fraudulent schemes amount to "racketeering" and a criminal conspiracy under the federal RICO statute. These are just claims intended to intimidate by calling them by another name. These claims are deficient as a matter of law and are denied.

III. <u>**Pearson's Cynical Strategy**</u>

A close reading of the Demand will show that the overwhelming majority of the allegations refer to what Zippy allegedly did to "Franchisees," not what Zippy allegedly did to Pearson. There is a reason for that- - - Pearson knows that that Zippy did nothing wrong to him so he is trying to show that wrongs were committed against others and hope the Panel will assume that, if it happened to some it must have happened to all. But that is not the case and the facts will show that Zippy did nothing wrong. More important, what may or may not have happened to others is irrelevant and should not even be considered by the Panel.

Pearson also makes irrelevant allegations against Respondent Rick Del Sontro and his involvement in another business. Those allegations are, like much of the Demand, irrelevant to any wrongs allegedly caused to Pearson and should be ignored by the Panel.

Pearson has included allegations concerning non-party Virgo Investment Group, LLC ("Virgo") for no valid reason other than to create prejudice. Virgo had no relationship with Pearson and played no role in any alleged wrongdoing. Pearson alleges that Virgo somehow conspired with Zippy and many of Zippy's employees to harm not just Pearson, but all Zippy franchisees. That is, to be charitable, utter nonsense.

To make matters worse, Pearson alleges violations of the Racketeering Influenced and Corrupt Organizations Act ("RICO"), once again for the sole purpose of creating prejudice and diverting the arbitration panel (the "Panel") from recognizing that nothing that happened to Pearson was the fault of any of the Respondents. Stated simply, Pearson's alleged losses were caused by his own actions, and he contractually disclaimed and released all claims asserted in

this case.

      Moreover, the RICO claims are deficient as a matter of law because: (i) a RICO enterprise cannot exist between an entity (Zippy Shell) and its employees (individual Respondents) or affiliate (Pack Rat); (ii) the Demand does not allege, and Claimants cannot prove, the requisite pattern of racketeering activity; and, (iii) this business dispute cannot otherwise satisfy the elements of a RICO claim.

      Pearson relies on so-called "grossly inflated proformas," but the facts will show that the figures in those documents were determined primarily by Pearson himself. To the extent Zippy participated with Pearson in the preparation of a spreadsheet or "proforma," those numbers were never intended to be representations of what Pearson could reasonably expect from his business and Pearson knows that. Indeed, he signed an acknowledgement disclaiming the existence of any representations and any reliance thereon in the Franchise Agreement.

      Pearson also alleges that the acquisition of Pack-Rat (i) somehow violated Zippy's obligations under the Franchise Agreement and (ii) was consummated with the intent to harm the Zippy franchisees. However, the Franchise Agreement expressly allowed Zippy to acquire or be acquired by a competing brand, which is precisely what Zippy did. As for the claim that Zippy intentionally tried to harm its franchisees, such a claim is categorically denied. Logic dictates that there is no rational basis for attempting to harm franchisees; Zippy makes money from its franchisees. The only reason to sell franchises is to develop a method of distributing your product or service without using your own money for the required equity investment for each territory. Although there can certainly be reasonable disagreement on whether to choose franchising in the first instance, once you do it, it makes no economic sense whatsoever to sabotage your own franchisees. Further, there is no evidence of any such intent or plan to harm or abandon the Zippy Shell Franchise System.

      Perhaps the most imaginative of the claims is what is referred to as the "Clandestine Operation", a colorful description of something that never happened. It is based on a belief that moves into and out of Pearson's territory were not assigned to Pearson, but instead were assigned to another Zippy franchisee. It is nothing more than a theory seized upon by Pearson, without any factual support, in the hope that it will prove to be true, but it most certainly is not. The facts will show that Pearson was assigned and handled not only the vast majority of the moves into and out of his territory, but numerous moves were assigned to Pearson in areas outside his territory, where he had no rights whatsoever. Simply put, Pearson was assigned many more moves than he was entitled to.

## FIRST AFFIRMATIVE DEFENSE

The Demand fails to state any claim upon which relief can be granted.

## SECOND AFFIRMATIVE DEFENSE

The damages allegedly suffered by Claimants were caused in whole or in part, or were exacerbated by, Claimants' own negligence, fraudulent, improper, unlawful, and/or culpable conduct or omissions and, accordingly, Claimants' claim is therefore barred or diminished in the proportion that such conduct or omissions bears to the total culpable conduct causing the alleged damages.

## THIRD AFFIRMATIVE DEFENSE

Any damages allegedly sustained by Claimants resulted from, or were proximately caused by, the acts, omissions or other culpable conduct of third parties over whom Respondents had no control.

## FOURTH AFFIRMATIVE DEFENSE

Claimants have suffered no damages or pecuniary loss attributable to actionable conduct by Respondents.

## FIFTH AFFIRMATIVE DEFENSE

Claimants' claims are barred based on the doctrines of waiver, estoppel, laches and/or unclean hands.

## SIXTH AFFIRMATIVE DEFENSE

Claimants' claims are precluded in whole or part to the extent there was a failure to mitigate damages.

## SEVENTH AFFIRMATIVE DEFENSE

Claimants' claims are barred by the applicable contractual limitations period and/or the applicable statute of limitations.

## EIGHTH AFFIRMATIVE DEFENSE

Claimants' claims are barred by releases signed by them in favor of Respondents.

## NINTH AFFIRMATIVE DEFENSE

Claimants' claims are barred by the doctrine of *in pari delicto.*

## TENTH AFFIRMATIVE DEFENSE

Claimants' claims are barred by the doctrines of accord and satisfaction, ratification, confirmation, and acquiescence.

**ELEVENTH AFFIRMATIVE DEFENSE**

Respondents' acts were undertaken in good faith without reckless disregard for Claimants' statutory rights, in compliance with and reliance on applicable laws, rules, regulations, rulings, approvals, interpretations, and orders and with reasonable grounds for believing that their actions were in compliance with the law.

**TWELFTH AFFIRMATIVE DEFENSE**

Respondents' decisions and administration of the franchise system were in compliance with the business judgment rule.

**THIRTEENTH AFFIRMATIVE DEFENSE**

Claimants' claims are barred as they cannot establish damages.

**FOURTEENTH AFFIRMATIVE DEFENSE**

Claimants' claims are barred as they breached the implied covenant of good faith and fair dealing.

**FIFTEENTH AFFIRMATIVE DEFENSE**

Claimants' claims are barred as they breached the franchise agreement.

**COUNTERCLAIMS**

Zippy, by and through its attorneys, Kaufmann Gildin & Robbins LLP, avers and alleges its counterclaims against Claimant/Counter-Respondents John Pearson ("Pearson") and Tensaw Investment Group, LLC ("Tensaw" and sometimes, collectively with Pearson, referred to as "Pearson") pursuant to Rule R-5(b) of the American Arbitration Association Commercial Arbitration Rules and Mediation Procedures, as follows:

**Parties**

1. Respondent/Counter-Claimant Zippy is a privately held company organized under the laws of the State of Delaware, with a principal place of business at 11640 Northpark Drive, Suite 200, Wake Forest, North Carolina. Zippy is the franchisor of the "Zippy Shell" brand in two related industries – mobile self-storage and moving.

2. Respondent Pack Rat is a limited liability company organized under the laws of the State of Delaware, with a principal place of business at 11640 Northpark Drive, Suite 200, Wake Forest, North Carolina. Pack Rat operates in the portable storage and moving industries. In June 2018, Zippy announced its acquisition of Pack Rat. Zippy and Pack Rat continue to operate as two distinct brands.

3. Claimant/Counterclaim Respondent John Pearson individually signed a Zippy

Franchise Agreement on or about December 23, 2015 and, pursuant thereto, Pearson operated his Zippy franchised business in the counties of Mobile and Baldwin, Alabama (the "Territory").

## Nature of Counterclaims

4. The following counterclaims for money damages arise out of Pearson's breach of his Zippy Franchise Agreement and related agreements. As a result of these and other contractual defaults, Pearson is liable for past due amounts accrued prior to his premature abandonment and termination of the parties' Franchise Agreement in the approximate amount of $ 50,000. In addition, Pearson is liable for Zippy's lost profit damages incurred as a result of Pearson's premature abandonment and termination of his Franchise Agreement, in an amount to be determined at the hearing.

## Allegations Common to All Claims for Relief

### A.   The Zippy Shell System

5. Zippy was incorporated in the United States in 2009, and is the successor entity to Zippy Shell USA, LLC. The Zippy System consists of mobile, modular storage units that are comprised of two parts: a mobile "shell", which is essentially a simple licensed trailer; and a "cartridge", which is a removable cage that fits inside and is protected by the shell. A franchisee's pick-up truck delivers the shell-and-cartridge module to the customer's location, where belongings are placed inside the cartridge.

6. Once the customer finishes loading the cartridge, a pick-up truck retrieves the module and brings it to the franchisee's facility, where the cartridge is removed from the shell and stored. The franchisee may then reuse the shell to deliver other cartridges.

7. Zippy franchisees were, if they chose to participate and qualified, given the

 

opportunity by Zippy, through execution of separate agreements, to offer two separate additional services, ZipMove and Zip Relo. The ZipMove business is a long-distance OTR (over-the-road) service, moving cartridges from one address to another. Moves may require the cooperation of franchisees in multiple territories. The Zip Relo program provides ZipMove services for corporate and government clients.

### B.   The Franchise Agreement Between Zippy and Pearson

8. Effective December 23, 2015, Zippy entered into a Franchise Agreement with

Pearson, for the operation of a Zippy franchise located in the Territory.

9. The parties amended the Franchise Agreement through the execution of an Addendum to the Franchise Agreement, dated December 23, 2015.

10. Pursuant to Article 2 of the Franchise Agreement, the term of the agreement is twenty (20) years.

11. Pursuant to Article 4 of the Franchise Agreement, Pearson agreed to pay Zippy certain fees, including but not limited to monthly Cartridge License Fees, National Brand Building Fund Fees, and National Call Center Fees.

12. Pursuant to the Franchise Agreement, Pearson agreed to spend certain minimum amounts of money to market his Zippy franchised business.

13. Pursuant to the Franchise Agreement, Pearson agreed to pay Zippy certain non-refundable initial franchise fees.

14. The Franchise Agreement obligated Pearson to provide to Zippy within 15 days after the close of each calendar month financial statements of their franchises for the prior month and such other time periods prescribed by Zippy (§9.3[a]). The Franchise Agreement also conferred upon Zippy the right to audit the books and records of Pearson's franchised business (§9.3[b], [c]).

15. Pursuant to Section 13.4(a) of the Franchise Agreement, the parties "agree to submit any claim or dispute, disagreement, or matter pertaining to interpretation of this Agreement or issues relating to the offer and sale of this license … to binding arbitration before the American Arbitration Association ("AAA") in the District of Columbia."

16. The Franchise Agreement also provides, in Section 13.7, that the prevailing party is entitled to reimbursement of its costs and expenses, including reasonable accounting and legal fees.

17. That same section of the Franchise Agreement also expressly provides for a one-year statute of limitations on all claims, "otherwise, the right to any remedy shall be deemed forever waived and lost" (§13.4[a]).

18. Pursuant to Section 13.8(a) of the Franchise Agreement, the parties agree that "this Agreement and the franchise shall be governed by the laws of the District of Columbia, without regard to principles of conflict of laws, subject to any restrictions imposed by the laws of the state governing your Zippy Shell Business."

19. The Franchise Agreement also includes an integration provision in which the parties expressly agree that, *inter alia,*

> THIS AGREEMENT CONSTITUTES THE ENTIRE AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CHANGED EXCEPT BY A WRITTEN DOCUMENT

SIGNED BY BOTH PARTIES …

> Any representations not specifically contained in this Agreement made prior to entering into this Agreement do not survive subsequent to the Effective Date of this Agreement.

(§13.10[a]) (emphasis in original).

20.     The Franchise Agreement also includes representations made by the franchisee in which it agreed to:

> [H]ave conducted an independent investigation of the business contemplated by this agreement and recognize that it involves business risks making the success of the venture largely dependent upon your own business abilities, efforts and judgments, and the services of those you employ, and you expressly disclaim the making of, and you acknowledge that you have not received or relied upon, any warranty or guarantee, express or implied, as to the potential volume, profits or success of the business venture contemplated by this agreement.

(§14.2[a]).

### C. *Termination of the Franchise Agreement*

21.     In or about May 2019, Pearson ceased operating his franchised business and effectively, without Zippy's consent, terminated his Franchise Agreement.

## FIRST COUNTERCLAIM
### (Breach of Contract – Franchise Agreement)

22.     Zippy repeats and realleges each and every allegation set forth in Paragraphs 1 through 21 as though fully set forth herein.

23.     As set forth above, Pearson signed a Franchise Agreement, whereby Zippy granted Pearson the exclusive right to conduct a business utilizing the Zippy Shell System within a designated Territory, and Pearson agreed to operate the business for the initial twenty (20) year term and, in accordance therewith, to comply with all certain monetary and non-monetary obligations set forth therein.

24.     Zippy has performed all conditions, covenants, and promises required on its part to be performed in accordance with the terms and conditions of the Franchise Agreement.

25.     Pursuant to Sections 4.8 and 12.1 of the Franchise Agreement, upon termination, all amounts owed by Pearson become due, and he cannot withhold those payments based on any of the allegations of breach by Zippy.

26.     As of the date of termination, Pearson owed a balance due to Zippy in the amount

of approximately $50,000.

27. Due to Pearson's premature termination of the Franchise Agreement and closure of his business, he is liable to Zippy for damages in an amount estimated to exceed $500,000, including lost cartridge license fees, brand building fund fees, and call center fees payable to Zippy over the remaining term of the Franchise Agreement.

28. Further, Zippy has been damaged in litigation fees and costs. Accordingly, Zippy seeks a judgment in its favor and an award of attorneys' fees and costs, pursuant to Article 13.7 of the Franchise Agreement.

## PRAYER FOR RELIEF

**WHEREFORE**, Zippy demands judgment in its favor on all claims herein against Claimant/Counter-Respondents as follows:

1. Dismissing all claims in the Demand, with prejudice;
2. Awarding Zippy Shell, Inc. damages for breach of the Franchise Agreement directly or indirectly caused to Zippy by Pearson, in an amount to be determined at Hearing with interest;
3. Awarding Zippy Shell, Inc. attorneys' fees and costs pursuant to the Franchise Agreement; and
4. All such further relief as may be just and equitable under the circumstances.

Dated: New York, New York
September 29, 2021

KAUFMANN GILDIN & ROBBINS LLP
*Attorneys for Respondent Zippy Shell Incorporated, 1-800-Rat-Pack, LLC, Mark Kuhns, Rick Del Sontro, Gareth Taylor, Danielle Scott, and Jay Young*

By: *s/Daniel Gildin*
Daniel Gildin, Esq.
Kevin M. Shelley, Esq.
767 Third Avenue, 30th Floor
New York, New York 10017
212.755.3100

TO:
Peter R. Silverman, Esq.
SHUMAKER, LOOP & KENDRICK, LLP
1000 Jackson Street
Toledo, OH 43604-5573
Phone: (419)241-9000
Fax: (419) 241-6894

*Attorneys for Claimants*